IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GUNNAR STEWARD                    :              CIVIL ACTION

         v.                       :

SEARS, ROEBUCK AND CO.            :              NO.  02-8921

## MEMORANDUM OF DECISION

THOMAS J. RUETER                                  June 13, 2006
United States Magistrate Judge

      Presently before the court is defendant's Renewed Motion for Judgment as a

Matter of Law, for a New Trial or, in the Alternative, for Remittitur (Doc. No. 68) (the

"Motion").  Defendant filed a Memorandum of Law in Support of the Motion (Doc. No. 83).

Plaintiff filed a Memorandum of Law in Opposition to the Motion (Doc. No. 85).  Defendant

then filed a Reply Brief in Further Support of the Motion (Doc. No. 86), and plaintiff followed

with a Surreply in Opposition to the Motion (Doc. No. 88).  Oral argument on the Motion was

presented on January 17, 2006 and a transcript of the proceeding was prepared (Doc. No. 90).

Thereafter, counsel each submitted a letter brief dated January 23, 2006 at the court's invitation.

The matter is now before the court for decision.  For the reasons stated herein, defendant's

Motion is GRANTED and judgment shall be entered as a matter of law in favor of defendant and

against plaintiff.  In the alternative, defendant's Motion for a New Trial is GRANTED.

## I.      BACKGROUND

      Plaintiff Gunnar Steward ("plaintiff") filed the instant action against his former

employer, defendant Sears, Roebuck and Co. ("defendant"), alleging that defendant terminated

his employment in violation of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 261, et seq.   The case was tried before a jury for eight days, from September 7, 2005

through September 19, 2005.  (Doc. Nos. 70-76.)

        **Plaintiff's Employment with Defendant.**  The facts presented at trial, considered

in the light most favorable to plaintiff, the non-movant, revealed that plaintiff was born on

February 17, 1951 and worked for defendant for approximately twenty-three years, beginning in

1979.  His employment with defendant was terminated on July 2, 2001.  (Tr. 618-19.)

        Plaintiff worked a number of positions with defendant and was promoted to

Technical Manager at defendant's Wilmington, Delaware facility in December, 1998.  (Tr. 15-

16.)  As Technical Manager, plaintiff supervised technicians who repaired lawn and garden

equipment, electronics, small appliances and refrigerators.  (Tr. 17-18, 30.)  In December 2000,

Philip Schweizer, then age thirty-three, became the District Service Manager at the Wilmington

facility.  (Tr. 143-44.)  Immediately preceding his employment with defendant, Schweizer was an

officer in the United States Air Force and was a graduate of the Air Force Academy.  (Tr. 274-

76.)  While employed with defendant, Schweizer supervised three other Technical Managers in

addition to plaintiff: Tony Carter (Wilmington facility), Brian Merkel (Reading facility) and

Joyce Sipple (Dover facility).  As a Technical Manager from 1998 through December, 2000,

plaintiff received positive performance reviews along with raises and bonuses.

        **The 2001 Performance Reviews.**  In late January, 2001, Schweizer gave

performance reviews to the Technical Managers.  Carter, Merkel and plaintiff received a score of

"3" in the category "individual performance/business results" and a score of "2" in "leadership

principles."[1]  (Exs. P-25, P-47, P-48.)  Sipple received a score of "3" in both categories.  (Ex. P-50.)

In late February 2001, Schweizer prepared and gave to plaintiff a Performance Plan for Improvement ("PPI").[2]  The reason for the PPI was stated as follows:  "Gunnar fails to uphold established Sear's [sic] processes and guidelines with those he supervises.  Additionally, Gunnar has failed to accomplish required duties of the Tech Manager Position."  (Exs. P-26, D-17.)  Schweizer provided a more detailed description of plaintiff's performance issues:

> – On the RMDS Multiple Attempt report it is clear that the same technicians often go out on the same call three and more times without input from the Tech Manager.
>
> . . . .

---

[1]      A score of "4" means "consistently exceeds expectations;" a score of "3" means "consistently meets expectations;" and a score of "2" means "some expectations met."  (Exs. P-17, P-47, P-48.)

[2]      The PPI is dated "21 February, 2000."  However, the signatures of plaintiff and Schweizer bear the date "2/3/01" and "2-3-01."  The "Follow-up Date" (generally a follow-up meeting is scheduled for approximately thirty days after the initial meeting) is noted as "3-6-01." See Ex. P-26.  There is no dispute that the year in which the PPI was prepared and given was 2001, not 2000.  See Tr. 685 (plaintiff agrees year was 2001).  Schweizer testified that he prepared the PPI on February 21, 2001, and gave it to plaintiff on March 2, 2001, explaining that when he dated the form "2-3-01," he was using the notations he had learned in the military and the month was the second number in the series of numbers.  Hence, to Schweizer, "2-3-01," represented the date March 2, 2001.  See D-17.  Following this explanation, the follow-up meeting date of "3-6-01," would translate to June 3, 2001.  This date does not make sense since the follow-up meeting is generally held thirty days after the PPI is given to the employee.  However, Schweizer's explanation that he gave the PPI to plaintiff on March 2, 2001 makes sense in light of the content of the PPI in which he stated that plaintiff provided certain information late, on February 7, 2001.  See P-26, D-17.  If the PPI was prepared and presented to plaintiff on February 3, 2001, Schweizer would have needed to be prescient to know that plaintiff would provide information on February 7, 2001.  Notwithstanding the foregoing, plaintiff admits that he received the PPI, and does not contest that defendant provided additional reviews substantially consistent with defendant's policy.  See Tr. 100.

– With Customer Montana Gunnar had to be repeatedly informed by the Parts Manager, Parts Pro, Customer Relations Supervisor, and myself before he called the customer.  This customer specifically asked to talk to the technicians [sic] manager and Gunnar did not reply as he was "gathering the facts".

. . . .

– Gunnar has failed to bring this information to the past 5 meetings.  Additionally, he has depended on the excellent work ethics of other tech managers to accomplish this for him.

– Gunnar consistently fails to meet deadlines.  He was tasked with providing his vacation numbers at the time of the DSM meeting in Gaithersburg.  He did not provide those numbers until 7 Feb 01.  Additionally, he depended on other tech managers to input the data for him.

– Your performance would be greatly improved by adherence to accepted Sear's business standards and established processes.

(Exs. P-26, D-17.)  Schweizer outlined the following plan for plaintiff:

– Gunnar will work with technicians to correct current deviations from accepted process.  He will be especially mindful of data integrity issues within the 8204-call load and his respective industries.

– Gunnar will meet all deadlines or provide a "heads-up" before breaking any deadlines.  Additionally, Gunnar will work with his fellow tech managers to get the required training/knowledge required to perform the functions and duties of his position.

Id.  In response, plaintiff wrote:  "I feel it unfair to be rated for a years [sic] performance by someone who has been here for a month.  It affected a years [sic] incentive.  I was given a division 5 months into the year that was running poorly.  We made improvements in that time."

Id.

Merkel, the Technical Manager in the Reading facility, also received a "3" in "business results" and a "2" in "leadership principles," and also was placed on a PPI.  Defendant

admitted that it has been unable to locate a variety of personnel documents including the Merkel PPI.

**The PDC Sweep.**  After plaintiff received the PPI, defendant undertook a process called the Parts Distribution Center Sweep (the "PDC Sweep").  Pursuant to this process, the parts stored in a facility's inventory would be reduced, with unnecessary parts being removed, or swept, from a facility's inventory.  (Tr. 216-28, 318.)  Prior to the PDC Sweep, plaintiff and the other Technical Managers attended a planning meeting.  (Tr. 483, 509-70, 1313.)  Schweizer testified that he saw the Technical Managers, including plaintiff, receive a manual regarding the PDC Sweep stating that only surplus parts should be removed from a facility.  (Tr. 510-11.)  Plaintiff denied receiving the manual but later admitted that he could have received a manual, but not the one in question.  (Tr. 216, 696.)  It is undisputed that plaintiff removed all parts from the Wilmington facility during the PDC Sweep, not just the unnecessary parts.  (Tr. 218, 211-22.)  Plaintiff explained that a PDC representative named "Hal" told him to remove all parts and that replacement parts would arrive the next morning.  Id.

The evidence also showed that Sipple and Merkel were responsible for the PDC Sweeps in their facilities in Dover and Reading, respectively.  (Tr. 71, 217.)  Sipple and Merkel removed only surplus parts from their facilities in the PDC Sweep, and retained the parts necessary to run their facilities.  (Tr. 217-18, 318-19, 1312.)

**The Lawn and Garden Backlog.**  As a result of the lack of parts in the Wilmington facility, a backlog of lawnmower and tractor repairs occurred.  (Tr. 222-23.)  Plaintiff admitted that each spring, the Technical Managers prepare for an influx of lawnmower repairs in preparation for the upcoming lawn and garden season.  (Tr. 223.)  The evidence

revealed that the backlog was unlike any backlog that previously had occurred in the Wilmington facility. (Tr. 75, 321, 549, 999, 1315.) It is undisputed that the lawnmower backlog was caused because plaintiff mistakenly shipped all the parts from the Wilmington facility during the PDC Sweep, and that it was plaintiff's responsibility to clear the backlog. (Tr. 705-06, 719.) Plaintiff attempted to obtain the necessary parts from defendant's Norristown facility, but that facility's support manager would not approve the transfer of parts. (Tr. 715-23.) Plaintiff admitted that he had no evidence that Schweizer played a role in the Norristown facility denying him the mower parts. (Tr. 719.) Because of the enormous backlog, Schweizer had to ship over one hundred mowers to a Sears facility in New York for repair. (Tr. 326.)

After the mowers were returned from New York, a second backlog developed. (Tr. 731.) Schweizer worked on a Sunday with plaintiff's technicians to address the second backlog. (Tr. 731-32.) Plaintiff admitted that Schweizer's work on a weekend to address the second backlog was not done to discriminate against plaintiff for his age. (Tr. 734-35.)

Schweizer also complained that plaintiff failed to properly staff the shop in anticipation of the annual lawn and garden repair season. (Tr. 708.) Plaintiff admitted that he did not hire technicians in accordance with defendant's guidelines (Tr. 68), unlike Sipple (Tr. 1313-314) and Merkel (Tr. 73-74). Plaintiff testified that he had additional technicians "ready to go," but was waiting for approval from Human Resources. (Tr. 250-51.) Plaintiff did not follow up with Human Resources to determine whether approval was forthcoming. (Tr. 251.) Schweizer hired an additional technician for plaintiff's shop. (Tr. 346.) Plaintiff presented no evidence that Schweizer's criticism of plaintiff's hiring activities was related to plaintiff's age.

6

**The First Follow-Up Meeting.**  A follow-up meeting took place on April 26, 2001.  (Ex. D-17.)  At that time, Schweizer identified four additional customers with whom plaintiff failed to follow-up properly.  Id.  Schweizer also noted that plaintiff: (1) "[f]ailed to manage shop personnel to maximize productivity – Pandora constantly not in shop – detracting from others' work.  If shop calls are down redistribute or layoff;" and (2) "[f]ailed to get involved with PDC Process when you were identified as one of the leaders.  You were to take over when Cindy left."  Id.  According to the form, plaintiff finished the meeting by saying, "Is that it," and left.  Plaintiff signed the form and dated it April 26, 2001.  Id.

**The "Ageist" Comment.**  Shortly after the first follow-up meeting, defendant transferred responsibility for the maintenance of road technician trucks from the "truck stock specialist" to the Technical Managers supervising the various technicians.[3]  (Tr. 234, 811.)  When plaintiff complained to Schweizer about the additional responsibility, Schweizer said, "Hell, you're old enough, you should be able to handle this."  (Tr. 235.)  Plaintiff admitted that this was the only statement Schweizer ever made to him that referenced his age.  (Tr. 812.)

**The Second Follow-Up Meeting.**  A second follow-up meeting was held on May 29, 2001.  (Ex. D-17.)  At that meeting, Schweizer identified three problems:  (1) "freon and OSHA compliance in shops;" (2) "ready times among HA/HE techs;" and (3) "follow through with customers."  Id.  Schweizer signed this form on May 29, 2001.  Id.  Schweizer provided plaintiff with three items to be completed over the course of thirty days:  (1) customers leaving messages to be called must be contacted within the business day that you receive the message;

---

[3]       "Road" technicians travel to customer homes and perform in-home repairs on the products.  "Shop" technicians perform repairs at Sears' facilities on products customers bring in for repair.  (Tr. 25, 281-82.)

(2) shops must be managed so that promise dates are met and multiple attempts[4] should not

exceed three for the same technician without intervention by plaintiff; and (3) the tractor yard

must be cleaned and all merchandise identified and organized by the end of the day on June 4,

2001.  Id.  Plaintiff admitted that none of the tasks assigned to him on the performance plan was

unreasonable and that he understood that the failure to complete any of the tasks could lead to his

termination.  (Tr. 747.)[5]

> On May 31, 2001, plaintiff provided the following comments:
>
> 1.      I will continue to follow up on cust. inquirys [sic] a [sic] timely as
> possible.  Do [sic] to . . . the lack of a parts manager and a large turn over
> of personel [sic] in Cust. Relations the inquiries have increased.
>
> 2.      We will continue to monitor promise dates with Routing to schedule
> pending calls.  The lack of parts at the beginning of the season set us back,
> and the loss of a full time shop tech plus at [sic] tech with a bad back and
> one with kidney stone surgery pending has hampered our progress.  We
> seem to be moving forward now.
>
> 3.      As stated in the e-mail I sent you, I will try to have the tractor yard
> finished by the June 4th deadline.  I am short of help.  1 tech is off with
> surgery and the other can't work overtime.

Ex. D-17.  Plaintiff admits that Schweizer's criticism regarding freon storage was not age related.

(Tr. 746-47.)

---

[4]      "Multiple attempts" refers to the situation where a technician attempts to repair
the same problem with multiple visits to the customer.  (Ex. P-26.)

[5]      Plaintiff argued that it was not his responsibility to clean and organize the tractor
yard.  (Tr. 230.)  However, he admitted that Schweizer could change the duties of the Technical
Managers who reported to him and that it was not unreasonable for Schweizer to assign to him
the duty of cleaning and organizing the tractor yard since he was the Technical Manager
responsible for the tractor repairs.  (Tr. 755-56.)

By e-mail dated May 30, 2001, plaintiff informed Schweizer that he was unsure whether he could clean and organize the tractor yard by the June 4 deadline.  (Ex. D-18, Tr. 241.)  Schweizer informed plaintiff that June 4 was a "hard deadline" and expected him to meet it.  (Ex. D-19, Tr. 243.)  Plaintiff worked on the tractor yard during his normal work day, when he had spare time in the day or in the evening.  He did not work on the Saturday before the June 4 deadline.[6]  (Tr. 765.)  He failed to clean up the tractor yard by the June 4th deadline.

**Plaintiff's Termination.**  Schweizer prepared a Notice of Termination dated June 27, 2001 and presented it to plaintiff on July 2, 2001.  (Ex. P-43.)  The reasons for plaintiff's termination were stated as follows:  "Mr. Steward has demonstrated a lack of ownership of the responsibilities of a Technical Manager at Sears Product Repair Services."  Id.  Schweizer listed the following three behaviors as leading to plaintiff's termination:

1. Although Mr. Steward has increased his contact with customers, the level of service provided is not at a level commiserate [sic] with his position.

2. Mr. Steward's failure to satisfy customers is demonstrated in missed promise dates in the shop.  This is a direct result of Mr. Steward's failure to take ownership of the shop workload.

3. In following through on the last review, dated 5-31-2001, there were specific responsibilities outlined to Mr. Steward.  Mr. Steward was to ensure that the outside storage area for the Lawn and Garden Shop was cleaned, organized and all equipment identified by 6-4-2001.  Mr. Steward failed to meet the agreed upon deadline and further more [sic] failed to keep me informed or request an extended deadline.

Id.

---

[6]      It would not have been unusual for plaintiff to work on a Saturday.  Plaintiff testified that he would work on a weekend.  (Tr. 785, 810 (plaintiff admitted that Technical Managers were expected to "work more" and that he worked "40 plus hours a week"), 827.)

9

**The Instant Lawsuit.**  As stated above, plaintiff filed the instant action against defendant alleging that defendant terminated his employment due to his age in violation of the ADEA.  Plaintiff contends that similarly situated, sufficiently younger employees were treated more favorably than he was based solely upon their ages.[7]

**The Jury Verdict.**  The jury returned a verdict in plaintiff's favor on the age discrimination claim on September 20, 2005.  The jury awarded back pay in the amount of

---

[7]      During the course of this litigation, plaintiff's contentions have changed many times.  For example, in opposition to defendant's motion for summary judgment, plaintiff contended that his duties were assumed by fellow Technical Managers Brian Merkel, Mark DeWit, Tony Carter and an employee later hired to replace Carter, Russ Apple (age 42).  See Steward v. Sears, Roebuck & Co., 312 F. Supp. 2d 719, 726 (E.D. Pa. 2004).  At trial, plaintiff did not contend that Russ Apple assumed any of plaintiff's duties after plaintiff was terminated and apparently has abandoned this claim.

In his earlier decision, Judge DuBois concluded that the instant matter was not a "reduction in force" ("RIF") case.  See id. at 725-26.  As explained by Judge DuBois, a case is not a RIF case where the employee's duties are absorbed by other employees.  Id. at 725.  In his Memorandum of Law in Opposition to the Motion, plaintiff stated that his "case does not involve a RIF, job elimination."  (Pl.'s Mem. of Law Opp. Mot. at 46.)  However, in his Surreply in Opposition to the Motion, plaintiff argued that the instant matter was a RIF since plaintiff was not replaced.  (Pl.'s Surreply at 10.)

In plaintiff's Memorandum of Law in Opposition to the Motion plaintiff asserts that "[d]efendant retained younger employees and redistributed Mr. Steward's work among them."  Id. at 2.  Hence, plaintiff contends that he was not replaced, rather his duties were absorbed by other employees.  This is consistent with counsel's argument in closing argument at the trial, in which plaintiff's counsel stated that plaintiff was not replaced, but that his duties were assigned to other individuals.  Counsel stated, "And his job duties were assigned to substantially younger employees, including Mr. DeWit, Mr. Merkel, and Mr. Carter."  (Tr. 1427.)  Yet, during the oral argument on the Motion, the court asked plaintiff's counsel:  "[W]ho in your view, replaced Mr. Steward, if – did anybody replace him?"  Counsel replied as follows:  "Clearly, the testimony establishes that he was replaced. . . . DeWit replaced Mr. Steward."  (N.T., 1/17/06, at 60.)  And see id. at 60-64.  The court specifically asked plaintiff's counsel during oral argument on January 17, 2006, "[Y]our argument is that DeWit replaced him?"  Id. at 61.  Counsel replied, "Hm-hmm."  Id.  The inconsistencies in plaintiff's arguments may be a by-product of the deficiencies in plaintiff's prima facie case, but they have made the court's task in deciding the instant motions more difficult than was necessary.

$92,985.00 and front pay in the amount of $148,000.00.  See Jury Interrogatory Form (Doc. No. 62).  The jury found in favor of defendant on the question of "willful" discrimination under the ADEA, and no liquidated damages were awarded.  Id.

Defendant contends that the jury's verdict cannot stand as the court should have granted defendant's motion for a directed verdict at the close of plaintiff's case and/or at the close of all evidence, as plaintiff failed to prove a prima facie case of age discrimination.  Even if plaintiff was found to have proven a prima facie case of age discrimination, defendant urges that the jury's verdict cannot stand because there was insufficient evidence of intentional discrimination presented at trial to permit the case to go to the jury and/or for the jury to return a verdict for plaintiff.  Defendant further contends that critical errors in the jury instructions and misconduct by plaintiff's counsel at trial rendered the trial unfair and so prejudiced defendant's right to a trial that a new trial is required.  Finally, defendant argues that the jury's award of damages is contrary to the law and evidence presented at trial.  Plaintiff contends that the Motion is frivolous.

## II.    DISCUSSION

In the Motion, defendant asks the court, alternatively, to enter judgment in favor of defendant as a matter of law pursuant to Fed. R. Civ. P. 50(b), for a new trial pursuant to Fed. R. Civ. P. 59(a)(1), or for remittitur.

### A.    **ADEA Claim**

Plaintiff claims that defendant terminated his employment because of his age in violation of the ADEA.  The ADEA prohibits age discrimination in employment against any person over the age of forty years.  29 U.S.C. § 623(a)(1).  A plaintiff can prevail on an age

discrimination claim by presenting either direct or circumstantial evidence.  When there is no direct evidence of discrimination, the plaintiff may establish discrimination through circumstantial evidence using the three-prong burden shifting analysis originally set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under McDonnell Douglas, the plaintiff must first establish a prima facie case of age discrimination by showing: (1) that he is over forty years of age; (2) that he is qualified for the position in question; (3) that he suffered an adverse employment decision; and (4) that he was replaced by a sufficiently younger person to permit an inference of age discrimination.  In the instant matter, the parties stipulated to the first three prongs of the prima facie case.  The interpretation of the fourth prong as it applies to the facts in this case, i.e. was plaintiff "replaced," and whether plaintiff satisfied the other requirement of the fourth prong, are at issue in this case.

If the plaintiff establishes a prima facie case, McDonnell Douglas shifts the burden to the defendant to produce evidence of a legitimate nondiscriminatory reason for the adverse employment decision.  This burden is one of production, not persuasion.  Brewer v. Quaker State Oil Refinery Corp., 72 F.3d 326, 330 (3d Cir. 1995).  If the defendant offers a legitimate reason for the adverse employment decision, the plaintiff must introduce evidence leading the factfinder either to "disbelieve the employer's articulated legitimate reasons or to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Id. at 331 (quoting Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie

12

case, suffice to show intentional discrimination."). <u>See also</u> <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (same); <u>Steward v. Sears Roebuck & Co.</u>, 312 F. Supp. 2d 719, 724-25 (E.D. Pa. 2004) (granting in part and denying in part defendant's motion for summary judgment in the instant case) (same). The Court was careful to note, however, that it is not enough to simply disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination. <u>St. Mary's Honor Center</u>, 509 U.S. at 511 n.4, 519. The plaintiff retains the burden of persuasion at all times. <u>United States Postal Serv. v. Aikens</u>, 460 U.S. 711, 715 (1983) (quoting <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)).

      **B.**     **<u>Motion for Judgment as a Matter of Law</u>**

      Defendant moves pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law. Rule 50(b) provides, in relevant part, as follows:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law . . . and may alternatively file a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
>
>     (1) if a verdict was returned:
>
>         (A) allow the judgment to stand,
>         (B) order a new trial, or
>         (C) direct entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

      Judgment as a matter of law should be granted only sparingly. <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1166 (3d Cir. 1993). A motion for judgment as a matter of law

should be granted only if, viewing the evidence in the light most favorable to the nonmovant and

giving the nonmovant the advantage of every fair and reasonable inference, there is insufficient

evidence from which a jury reasonably could find liability.  Lightning Lube, 4 F.3d at 1167

(citing Wittekamp v. Gulf & Western, Inc., 991 F.2d 1137, 1141 (3d Cir. 1993)).  In deciding a

motion for judgment as a matter of law, the court may not weigh the evidence presented at trial,

determine credibility of witnesses, or substitute its version of facts for that of the jury.  Id.  See

also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (same).  In addition,

the court must disregard all evidence favorable to the moving party that the jury is not required to

believe.  Id. at 151.  The Supreme Court explained that the court "should give credence to the

evidence favoring the nonmovant as well as that evidence supporting the moving party that is

uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested

witnesses."  Id. (quotation omitted).  In making its determination, the court should review all of

the evidence in the record.  Id. at 150.  Although judgment as a matter of law should be granted

only sparingly, "a scintilla of evidence is not enough to sustain a verdict of liability."  Lightning

Lube, 4 F.3d at 1166 (citing Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993)).

See also Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655, 665 (3d Cir. 2002) (same).  "'The

question is not whether there is literally no evidence supporting the party against whom the

motion is directed but whether there is evidence upon which the jury could properly find a

verdict for that party.'"  Lightning Lube, 4 F.3d at 1166 (quoting Patzig v. O'Neil, 577 F.2d 841,

846 (3d Cir. 1978)).

          Defendant contends that it is entitled to judgment as a matter of law on several

grounds.  First, defendant argues that it is entitled to judgment as a matter of law because

14

plaintiff failed to prove a <u>prima</u> <u>facie</u> case of age discrimination.  Second, plaintiff contends that

the court should grant it judgment as a matter of law because, on the evidence presented at trial,

no reasonable jury could conclude that age was a determinative factor in plaintiff's termination.

Finally, defendant urges that the court should grant its motion for judgment as a matter of law

because, on the evidence presented at trial, the jury was not entitled to infer discriminatory intent

from evidence of a <u>prima</u> <u>facie</u> case and disbelief of defendant's proffered reason for the

termination.

### 1.      Plaintiff Failed to Prove a Prima Facie Case of Age Discrimination

Defendant argues that it is entitled to judgment as a matter of law because plaintiff

failed to prove a <u>prima</u> <u>facie</u> case of age discrimination for the following reasons:  (1) plaintiff

did not prove at trial that he was replaced by a sufficiently younger person to create an inference

of age discrimination, and (2) he did not prove at trial that a similarly situated, sufficiently

younger technical manager was treated better than plaintiff.  (Def.'s Mem. of Law Supp. Mot. at

37-41.)

### a.      United States Postal Service v. Aikens

Following oral argument on the motion, the court asked the parties to brief the

question of whether this court may grant the motion solely on the basis of plaintiff's failure to

present at trial evidence sufficient to prove a <u>prima</u> <u>facie</u> case of age discrimination, particularly

in light of <u>United States Postal Service v. Aikens</u>, 460 U.S. 711 (1983).  Counsel each submitted

letter briefs addressing this question.  Defendant contends that <u>Aikens</u> and its progeny indicate

that plaintiff's failure to prove a <u>prima</u> <u>facie</u> case of age discrimination at trial is sufficient

grounds upon which to enter judgment as a matter of law in favor of defendant.  (Def.'s Letter

Brief dated Jan. 23, 2006 ("Def.'s Ltr. Br.").)  Plaintiff argues that since this case went to the jury and the jury reached a verdict, the court is no longer concerned with plaintiff's <u>prima facie</u> case, but whether substantial evidence supports the jury's verdict.  (Pl.'s Letter Brief dated Jan. 23, 2006 ("Pl.'s Ltr. Br.").)

In <u>Aikens</u>, an employment discrimination case based on race, the District Court, after a bench trial, entered judgment for the defendant, the Postal Service, but the Court of Appeals reversed.  460 U.S. at 713.  The Court vacated the Court of Appeals' judgment and remanded for reconsideration in light of certain Supreme Court precedent.  <u>Id.</u>  The Court of Appeals reaffirmed its earlier remand to the District Court.[8]  The Supreme Court granted <u>certiorari</u>.

The Postal Service argued that Aikens failed to prove a <u>prima facie</u> case of discrimination.  <u>Id.</u> at 713.  It appeared to the Court that at one point in the bench trial, the trial court concluded that the plaintiff, Aikens, had established a <u>prima facie</u> case.  <u>Id.</u> at 714 n.4.[9]  Aikens argued that he submitted sufficient evidence to establish a <u>prima facie</u> case.  <u>Id.</u> at 714.  The Court attempted to redirect the focus of the parties by stating as follows:  "Because this case has been fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question of whether Aikens made out a <u>prima facie</u> case."  <u>Id.</u> at 715.  The Court

---

[8]   The Court of Appeals held, in part, that the trial court erred when it required Aikens to show as part of his <u>prima facie</u> case that he was "as qualified or more qualified" than the individuals who were promoted.  <u>Aikens</u>, 460 U.S. at 713.  This issue is not present in the instant case.

[9]   The Court noted that when Aikens concluded his case in chief, the Postal Service moved to dismiss on the ground that there was no <u>prima facie</u> case.  The District Court denied this motion.  <u>Aikens</u>, 460 U.S. at 714 n.4.

then discussed the impact of the District Court's decision <u>not</u> to dismiss the action for lack of a

<u>prima</u> <u>facie</u> case.  The Court stated as follows:

> But when the defendant fails to persuade the district court to dismiss the
> action for lack of a prima facie case, and responds to the plaintiff's proof by
> offering evidence of the reason for the plaintiff's rejection, the factfinder must
> then decide whether the rejection was discriminatory within the meaning of Title
> VII.  At this stage, the [<u>McDonnell</u>] presumption "drops from the case," 450 U.S.
> at 255 n.10,  . . . and "the factual inquiry proceeds to a new level of specificity."
> <u>Id.</u> at 255.  .  .  .   Where the defendant has done everything that would be required
> of him if the plaintiff had properly made out a prima facie case, whether the
> plaintiff really did so is no longer relevant.

<u>Aikens</u>, 460 U.S. at 714-15 (footnote omitted).  <u>See also</u> <u>Whittington v. Nordam Grp., Inc.</u>, 429

F.3d 986, 993 (10th Cir. 2005) (after jury verdict, court's role is to review record for substantial

evidence supporting the jury's verdict).

The Third Circuit Court of Appeals also has addressed this issue and consistently

has held that after a case has been tried to a jury on the merits, "it is unnecessary for the appellate

court to decide whether a <u>prima</u> <u>facie</u> case had, in fact, been established."  <u>Bruno v. W.B.</u>

<u>Saunders Co.</u>, 882 F.2d 760, 764 (3d Cir. 1989), <u>cert.</u> <u>denied</u>, 493 U.S. 1062 (1990).  <u>See also</u>

<u>Billet v. CIGNA Corp.</u>, 940 F.2d 812, 817 (3d Cir. 1991) (same), <u>overruled</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u>

<u>grounds</u> <u>by</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993); <u>Blum v. Witco Chem. Corp.</u>,

829 F.2d 367, 372 n.2 (3d Cir. 1987) (same).

However, this does not mean that the court will never review a plaintiff's <u>prima</u>

<u>facie</u> case on post-trial motions after a jury verdict.  Under relevant case law since <u>Aikens</u>, when

a plaintiff attempts to establish discrimination through indirect evidence, such as in the instant

case, a plaintiff must establish both a <u>prima</u> <u>facie</u> case and introduce evidence from which the

factfinder could reasonably disbelieve the defendant's proffered reasons.  Defendant urges that in

a case such as the instant matter involving indirect evidence of discrimination, a finding that plaintiff failed to prove one of the two elements required, i.e. failed to prove a prima facie case, can and should end the court's inquiry.  In support of its position, defendant cites to Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

      The Supreme Court in Reeves instructed that although the presumption of discrimination drops from the case once the defendant meets its burden of production, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" 530 U.S. at 144 (quoting Burdine, 450 U.S. at 255).  Under Reeves and St. Mary's, when a plaintiff attempts to establish discrimination through indirect evidence, a plaintiff must establish a prima facie case and must introduce evidence from which the factfinder may reasonably disbelieve the defendant's proffered reason.  Reeves, 530 U.S. at 147, 149; St. Mary's, 509 U.S. at 508-11.  Were a jury to consider pretext without an underlying prima facie case, it would elevate evidence of pretext to the sole basis for finding liability.  This clearly is not the standard for establishing discrimination set forth in the Supreme Court precedent.  The Supreme Court explained in Reeves that examination of a plaintiff's prima facie case may be necessary when considering a motion for judgment as a matter of law.  The Court stated as follows:

        Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law. . . .  [A] prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability. . . .

18

<u>Reeves</u>, 530 U.S. at 148-49.

      The Sixth Circuit Court of Appeals addressed this exact issue in <u>Noble v. Brinker International, Inc.</u>, 391 F.3d 715 (6th Cir. 2004), <u>cert.</u> <u>denied</u>, 126 S. Ct. 353 (2005).  In <u>Noble</u>, the plaintiff, the jury verdict winner, argued that <u>Aikens</u> precluded the court, when confronted with defendant's motions for judgment as a matter of law and a new trial, from considering whether plaintiff proved his <u>prima</u> <u>facie</u> case.  <u>Id.</u> at 725. The Sixth Circuit rejected the plaintiff's argument stating as follows:

>     If the law were as [the plaintiff] contends, <u>Reeves</u> would have held merely that sufficient evidence to find that an employer's asserted justification is false may permit the trier of fact to conclude that the employer unlawfully discriminated.  The <u>Reeves</u> Court was well aware of its prior holding in <u>Aikens</u> and quoted extensively from it, but the Court nevertheless required that a plaintiff present <u>both</u> evidence supporting a <u>prima</u> <u>facie</u> case <u>and</u> evidence sufficient to support the factfinder's disbelief of the defendant's proffered reason.  [<u>Reeves</u>, 530 U.S.] at 148. . . .   The Court explained <u>Aikens</u>, stating "although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom.'"  <u>Id.</u> at 143 (citations omitted).  Likewise, in reviewing a Rule 50 motion, it is appropriate for a court to "consider the evidence establishing the plaintiff's prima facie case."  <u>Id.</u> . . .  If <u>Aikens</u> stood for the proposition that an appellate court must always assume that there is evidence supporting what the lower court accepted as the plaintiff's <u>prima</u> <u>facie</u>, the Supreme Court's reasoning and holding in <u>Reeves</u> would be inexplicable.  <u>Aikens</u> . . . make[s] clear that a court may not, after a trial on the merits, grant judgment as a matter of law <u>merely</u> <u>because</u> the plaintiff failed to establish a <u>prima</u> <u>facie</u> case, but when the indirect method of proof is the only remaining avenue by which a plaintiff can establish his claim of intentional discrimination, it is necessary and appropriate for a court to evaluate the evidence supporting the plaintiff's <u>prima</u> <u>facie</u> case. . . .  To hold as [the plaintiff] requests "would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and [the Supreme Court has] reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"  <u>Reeves</u>, 530 U.S. at 148 . . . (quoting <u>Hicks</u>, 509 U.S. at 524 . . . (quoting <u>Aikens</u>, 460 U.S. at 716. . . )).

<u>Id.</u> at 726-27.

Recently, the Third Circuit Court of Appeals addressed this issue in <u>McNulty v.</u>

<u>Citadel Broadcasting Co.</u>, 58 Fed. Appx. 556 (3d Cir. Feb. 26, 2003) (not precedential).  In

<u>McNulty</u>, a broadcaster sued his employer, a radio station owner, for employment discrimination.

The jury entered judgment in favor of the plaintiff and the defendant filed a motion for judgment

as a matter of law and a new trial.[10]  The Court of Appeals explained that because it reviewed the

evidence after the jury verdict, "we do not concern ourselves with the McDonnell Douglas

burden shifting analysis, but proceed to the ultimate determination of whether [the plaintiff] has

proven by a preponderance of the evidence that age was a determinative factor in his

termination."  <u>Id.</u> at 563 (citing <u>Aikens</u> and <u>Billet</u>).  However, the Third Circuit Court of Appeals

realized that the inquiry into the sufficiency of the evidence and into whether plaintiff established

a <u>prima facie</u> case are not all that different.  The Third Circuit Court of Appeals stated:

> In doing so, however, our inquiry into the sufficiency of the evidence does not
> differ markedly from inquiring into whether McNulty has submitted evidence
> sufficient to establish the elements of a prima facie case and then sustained his
> burden of proving that Citadel's reasons were mere pretext, see <u>Bruno v. W.B.</u>
> <u>Saunders Co.</u>, 882 F.2d 760, 764 n. 2 (3d Cir. 1989).

<u>Id.</u>  <u>See</u> <u>also</u> <u>Bruno</u>, 882 F.2d at 764 n.2 (considering a motion for judgment as a matter of law

and a new trial, the court noted although it did not address defendant's challenges in terms of a

<u>prima facie</u> case, "it may be that [the court's] inquiry into the sufficiency of the evidence to

support . . . an inference [of age discrimination] will not differ markedly from an inquiry into

whether the plaintiff has introduced evidence sufficient to establish one of the elements essential

to her <u>prima facie</u> case.") (citations omitted).

---

[10]     The court affirmed the district court's denial of the motion for judgment as a
matter of law, but granted defendant's motion for a new trial on evidentiary grounds.  <u>McNulty</u>,
58 Fed. Appx. at 559.

Having considered the parties' letter briefs and the relevant case law, this court concludes that, in consideration of defendant's motion for judgment as a matter of law, it may consider whether plaintiff established a <u>prima facie</u> case of age discrimination and the strength of that <u>prima facie</u> case in determining whether plaintiff carried his ultimate burden of proving by a preponderance of the evidence that age was a determinative factor in his termination. Despite his other arguments, plaintiff ultimately seems to agree that this is the court's proper role. <u>See</u> Pl.'s Ltr. Br. at 2 (citing <u>Reeves</u> and <u>St. Mary's</u>), 5 ("According to <u>Aikens</u> and its progeny, the court should review the prima facie case <u>and</u> the additional evidence of pretext in deciding whether there is substantial evidence of record to deny defendant's motion for judgment as a matter of law.").

For all the above reasons, the court will review the <u>prima facie</u> case when deciding whether plaintiff satisfied his ultimate burden of proving by a preponderance of the evidence that age was a determinative factor in his termination.

      **b.**    **Plaintiff's Prima Facie Case Fails Because He Did Not Prove At Trial That Someone "Sufficiently Younger" Assumed His Duties Or Was <u>Treated More Favorably</u>**

      **i.**    <u>**The Ages of the Comparators**</u>.  Defendant contends that plaintiff's age discrimination claim should have failed as a matter of law because plaintiff failed to prove the fourth prong of the <u>prima facie</u> case:  that someone sufficiently younger assumed his duties or was treated more favorably so as to create an inference of age discrimination.[11]  As discussed in

---

[11]    Defendant also contends that this court erred when it concluded that plaintiff could satisfy the fourth prong of the <u>prima facie</u> case by proving that a similarly situated, sufficiently younger person assumed plaintiff's duties or was treated more favorably than plaintiff, rather than replaced plaintiff.  Defendant argues that this error requires that the court grant a new trial.  The court disagrees and will address this issue in detail later in this

detail above, this court will review whether plaintiff satisfied the fourth prong of the prima facie case in considering whether plaintiff met his ultimate burden of proving intentional discrimination by a preponderance of the evidence.

Plaintiff contends that sufficiently younger employees, Tony Carter (age forty-five), Mark DeWit (age thirty-three), and Brian Merkel (age thirty-five) assumed plaintiff's duties after he was terminated.[12]  (Pl.'s Mem. of Law Opp. Mot. at 35.)  The average age of these individuals is 37.7 years.  The difference between plaintiff's age when terminated and the average age of these three individuals is 12.3 years.  Plaintiff also contends that the jury could have concluded that Support Manager Mark DeWit alone assumed plaintiff's duties and, at age thirty-three, was sufficiently younger than plaintiff in satisfaction of the requirements of the prima facie case.  (Pl.'s Surreply at 11.)

Defendant contends that Carter, age forty-five years, assumed plaintiff's duties, yielding a difference of five years between his age and plaintiff's age when terminated.  (Def.'s Mem. of Law Supp. Mot. at 38 (citing Tr. at 1013 (testimony of Carter)).)  In the alternative,

---

Memorandum of Decision.  For the purposes of this section of the Memorandum of Decision, the focus of the court's discussion is only whether someone "sufficiently younger" assumed plaintiff's duties or was treated more favorably than plaintiff, not whether plaintiff had to be "replaced" to satisfy the fourth prong of the prima facie case.

[12]     The ages reflected were the individuals' ages as of the date plaintiff's employment was terminated on July 2, 2001.  The evidence showed that the other Technical Managers had the following birth dates:  Mr. Carter –  3/27/56 (Ex. P-48); Mr. Merkel – 2/14/66 (Ex. P-47); and Ms. Sipple – 5/19/41 (Ex. P-50).  Support Manager Mark DeWit was born on October 16, 1967 (Ex. P-49).  In opposition to defendant's motion for summary judgment, plaintiff contended that his duties were assumed by Merkel, DeWit, Carter and an employee later hired to replace Carter, Russ Apple (age 42).  See Steward v. Sears, Roebuck & Co., 312 F. Supp. 2d 719, 726 (E.D. Pa. 2004).  At trial, plaintiff did not contend that Russ Apple assumed any of plaintiff's duties after he was terminated and apparently has abandoned this claim.

defendant asserts that, based on the testimony of Phil Schweizer, see Tr. 362, the remaining three Technical Managers assumed plaintiff's duties, namely:  Joyce Sipple (age 60 at the time plaintiff was terminated), Merkel, and Carter, with some assistance from DeWit. Id. at 39.  The average age of these four individuals is 43.25 years.  The difference between plaintiff's age when terminated and the average age of Carter, Merkel, Sipple and DeWit was 6.75 years.

Defendant also contends that DeWit should not be counted as assuming plaintiff's duties because he was not a Technical Manager at the time plaintiff was terminated.  The evidence at trial showed as follows with respect to the assumption of plaintiff's duties after his termination.

**Tony Carter.**  Tony Carter testified that he assumed plaintiff's duties after plaintiff was terminated.  (Tr. 944.)  Carter was forty-five years of age when plaintiff was terminated.  (Ex. P-48.)  Schweizer testified that plaintiff's duties were assumed by the three remaining Technical Managers:  Merkel, Sipple and Carter, as well as the Support Manager DeWit who took over "some of the responsibility."  (Tr. 362.)  Hence, Carter assumed at least some of plaintiff's responsibilities after plaintiff was terminated.

**Brian Merkel.**  Again, Schweizer testified that plaintiff's duties were assumed by the three remaining Technical Managers:  Merkel, Sipple and Carter, with the Support Manager DeWit taking over some of the responsibility.  (Tr. 362.)  At the time plaintiff was terminated, Merkel was thirty-five years of age.  (Ex. P-47.)  Merkel testified as a witness for plaintiff, but plaintiff did not ask him whether he assumed any of plaintiff's duties after plaintiff was terminated.  The evidence shows that Merkel assumed some of plaintiff's duties after plaintiff was terminated.

23

**Joyce Sipple.**  Schweizer testified that Sipple, along with the other Technical Managers and DeWit, assumed plaintiff's duties after plaintiff was terminated.  (Tr. 362.)  Sipple was sixty years old at the time plaintiff was terminated.  (Ex. P-50.)  Sipple testified as a witness for plaintiff, but plaintiff did not ask her whether she assumed any of plaintiff's duties.

Plaintiff asserts that Sipple should not be counted as having assumed any of plaintiff's duties because she was located at the Dover, Delaware facility, not the Wilmington facility.  (Pl.'s Surreply at 7.)  However, plaintiff's argument that Sipple should be excluded from any calculation is not supported by the evidence.  First, plaintiff argues that Merkel should be included in the calculation of ages even though he, like Sipple, was not located at the Wilmington facility.  Merkel worked at the Reading, Pennsylvania facility.  Plaintiff's argument appears to be based more upon the fact that Sipple, unlike Merkel, is older than plaintiff, not that Sipple, like Merkel, worked at a different facility.  The fact that Sipple worked at the Dover facility is immaterial to whether she assumed any of plaintiff's duties after he was terminated.  Second, the evidence clearly shows that the four Technical Managers, plaintiff, Merkel, Sipple, and Carter, were treated as a "team."  The evidence shows that plaintiff, Carter, Merkel and Sipple all were supervised by Schweizer, worked together on various projects, and assisted one another.  Plaintiff testified that he, Carter, Merkel and Sipple worked as a "team."  (Tr. 194.)  See also Ex. P-40 (e-mail dated June 25, 2001 from Schweizer, addressing plaintiff, Merkel and Sipple as "Team"); Ex. D-10 (e-mail dated February 22, 2001 from DeWit, addressing plaintiff, Merkel, Carter and Sipple as "Team").  Hence, the evidence shows that Sipple assumed at least some of plaintiff's duties after he was terminated.

24

**Mark DeWit.**  Plaintiff asserts that Mark DeWit, age thirty-three at the time plaintiff was terminated, assumed some of plaintiff's duties.  Additionally, plaintiff urges that it was reasonable for the jury to conclude that DeWit alone replaced plaintiff.[13]  (Pl.'s Surreply at 6-7.)  Defendant contends that DeWit was not a Technical Manager at the time plaintiff was terminated and should not be counted as one of the individuals who replaced plaintiff.

The evidence shows that DeWit was not a Technical Manager at the time plaintiff was terminated.  Plaintiff attempted to prove that DeWit was a Technical Manager at the time plaintiff was terminated by introducing an exhibit which identified DeWit's position as Technical Manager for the year 2001.  See Ex. P-49.  DeWit testified, however, that the exhibit contained numerous errors and that he was not a Technical Manager as of the date of plaintiff's termination.  (Tr. 1280, 1282.)  Moreover, the testimony of the other Technical Managers, including plaintiff, consistently showed that DeWit was not a Technical Manager at the time plaintiff was terminated.  See Tr. 84 (Merkel's testimony), 134 (plaintiff's testimony), 372 (Schweizer's testimony) and 1282 (DeWit's testimony).  Hence, the evidence reveals that DeWit

---

[13]     Plaintiff repeatedly argues that, according to defendant's documents and DeWit's testimony, it would have been reasonable for the jury to conclude that DeWit, as the remaining Technical Manager in Wilmington as of the date of the trial, alone replaced plaintiff and assumed the Technical Manager position in July 2001.  See, e.g., Pl.'s Mem. of Law Opp. Mot. at 41, 44, 45, 45-46.  However, the evidence does not support this argument.  DeWit testified that he was not a Technical Manager as of the date plaintiff was terminated.  (Tr. 1282.)  The evidence also proved that the Wilmington facility has been consolidated with another facility and its services are provided, for the most part, by other facilities.  (Tr. 1283.)  Even though DeWit remains at what is now known as the Wilmington branch, he is not performing the same duties plaintiff performed at the time he was terminated.  Nothing in the evidence supports plaintiff's position that DeWit alone assumed plaintiff's duties and/or that he continued to perform those same duties as of the date of the trial.

was not a Technical Manager as of plaintiff's termination date and no evidence supports

plaintiff's argument that DeWit alone assumed all of plaintiff's duties after he was terminated.

Considering all of this evidence in the light most favorable to plaintiff, the verdict

winner, the evidence reveals that plaintiff's duties were assumed by the three remaining

Technical Managers, Carter, Merkel and Sipple, with some assistance from DeWit. The average

age of these four individuals is 43.25 years. Plaintiff was fifty years of age when he was

terminated by defendant. The difference between plaintiff's age when terminated and the

average age of those who assumed his duties is 6.75 years.

**ii.** **Comparators Not Sufficiently Younger.** Defendant contends that a 6.75

year age difference is not "sufficiently younger" for establishing a prima facie case of age

discrimination. Defendant relies primarily upon the Third Circuit's decision in Narin v. Lower

Merion School District, 206 F.3d 323, 333 n.9 (3d Cir. 2000). In Narin, the court concluded that

a seven year age difference was insufficient to establish a prima facie case of age discrimination.

Id. at 333 n.9.[14] Plaintiff first attempted to distinguish Narin on the grounds that it was a failure

to hire case and because the plaintiff in that case was "46" years of age, younger than the

individuals hired for the positions. (Pl.'s Mem. of Law Opp. Mot. at 44-45.) However, the

plaintiff in Narin was fifty-six years of age and the Third Circuit Court of Appeals clearly held

that the plaintiff had failed to establish a prima facie case of age discrimination where only seven

---

[14]      In Narin, the plaintiff was fifty-six years of age at the relevant time period. A
forty-nine and fifty-four year old were hired instead of plaintiff for two separate jobs. The court
compared each successful applicant's age to the age of the plaintiff; it did not combine the ages.
In the instant matter, plaintiff's duties were assumed by four individuals, hence combining the
ages is appropriate. The parties agree. See Def.'s Mem. of Law Supp. Mot. at 37-41, Pl.'s Mem.
of Law Opp. Mot. at 42.

years separated the plaintiff's age from those who ultimately were hired.  Narin, 206 F.3d at 333 n.9.

Moreover, as pointed out by both parties, the Third Circuit Court of Appeals has not found that an age difference of less than seven years is sufficient to establish a prima facie case of age discrimination.  See Pl.'s Mem. of Law Opp. Mot. at 39, Def.'s Mem. of Law Supp. Mot. at 37-41.  See Barber v. CSX Distribution Servs., 68 F.3d 694, 699 (3d Cir. 1995) (eight year age difference sufficient to establish prima facie case); Sempier v. Johnson, 45 F.3d 724, 729-30 (3d Cir. 1994) (decided prior to Narin, nine year age difference sufficient to establish prima facie case), cert. denied, 515 U.S. 1159 (1995).[15]  See also Stafford v. Noramco of Del., 2000 WL 1868179, at *3 n.14 (D.Del. Dec. 15, 2000) (citing Third Circuit Court of Appeals cases and holding that to establish a prima facie case, the "hired person must be at least eight years younger than the plaintiff, aff'd, 32 Fed. Appx. 32 (3d Cir.), cert. denied, 537 U.S. 917 (2002); Becker v. ARCO Chemical Co., 15 F. Supp. 2d 600, 607-08 (E.D. Pa. 1998) (eight year age difference sufficient), rev'd in part on other grounds, 207 F.3d 176 (3d Cir. 2000); Bernard v. Beth Energy Mines, Inc., 837 F. Supp. 714, 716-17 (W.D. Pa. 1993) (plaintiff failed to establish a prima facie case where plaintiff was replaced by individuals three and one-half and seven years younger), aff'd, 31 F.3d 1170 (3d Cir. 1994).  And see Grosjean v. First Energy Corp., 349 F.3d 332, 338-40 (6th Cir. 2003) (collecting cases and stating "[t]he overwhelming body of cases in

_____

[15]     Plaintiff cites to Sempier for the proposition that a four year age difference is sufficient to establish a prima facie case of age discrimination.  (Pl.'s Mem. of Law Opp. Mot. at 39.)  However, in that case the Third Circuit Court of Appeals concluded that the combined age difference of ten years between the two individuals who assumed the plaintiff's duties (one was four years younger than the plaintiff and the other was fourteen years younger) and the plaintiff's age was sufficient to satisfy the fourth prong of a prima facie case.  Sempier, 45 F.3d at 726, 729-30.

most circuits has held that age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination <u>prima</u> <u>facie</u> case"), <u>cert.</u> <u>denied</u>, 541 U.S. 1010 (2004).[16]

Considering all evidence in the light most favorable to plaintiff and giving plaintiff the advantage of every fair and reasonable inference, plaintiff failed to establish a <u>prima</u> <u>facie</u> case of age discrimination because he failed to prove that someone sufficiently younger assumed his duties or was treated more favorably.[17]

> **c.    Plaintiff's Prima Facie Case Fails Because He Did Not Prove At Trial That Someone "Similarly Situated" Assumed His Duties Or Was Treated More Favorably**

Defendant next contends that plaintiff failed to establish a <u>prima</u> <u>facie</u> case because the comparators, <u>i.e.,</u> Carter, Merkel, DeWit and Sipple, even assuming they were

---

[16]    The authority cited by plaintiff in his briefs does not undermine the precedential effect of <u>Narin</u>.

[17]    Judge DuBois concluded that plaintiff established a <u>prima</u> <u>facie</u> case in his Memorandum and Order dated April 6, 2004 denying defendant's motion for summary judgment. Judge DuBois relied upon <u>Sempier</u> and found that "the combined age differential between Steward and the younger employees who were allegedly treated more favorably" was sufficient to establish a <u>prima</u> <u>facie</u> case. <u>Steward v. Sears Roebuck & Co.</u>, 312 F. Supp. 2d 719, 726 (E.D. Pa. 2004).  However, the court's analysis at the summary judgment stage was based upon evidence different from that presented at trial.  During the summary judgment stage, plaintiff omitted Sipple, and argued that plaintiff's duties were assumed by Merkel, Carter, DeWit and Russ Apple, age forty-two. <u>Id.</u> at 12.  The average age of these four individuals is 38.75 years, for a difference of 11.25 years from plaintiff's age at termination.  Judge DuBois concluded that the age differential of over eleven years was sufficient to establish a <u>prima</u> <u>facie</u> case.  Plaintiff no longer contends that Russ Apple assumed any of plaintiff's duties after he was terminated. The evidence at trial showed that Sipple shared in assuming plaintiff's duties.  The deletion of Apple, age forty-two, and the addition of Sipple, age sixty, changes the court's conclusion regarding whether someone sufficiently younger assumed plaintiff's duties or was treated more favorably.  Hence, Judge DuBois' conclusion at summary judgment stage is not binding on the court after trial, especially where, as here, the evidence offered at trial differed significantly from that offered in opposition to summary judgment.

"sufficiently younger," were not "similarly situated" as required by the fourth prong of the prima

facie case.  In order to be "similarly situated" for purposes of establishing a prima facie case,

plaintiff must prove that the comparator employees dealt with the same supervisor, were subject

to the same standards, and engaged in the same conduct without such differentiating or

mitigating circumstances that would distinguish their conduct and the employer's treatment of

them for it.  Bullock v. Children's Hosp. of Philadelphia, 71 F. Supp. 2d 482, 489-90 (E.D. Pa.

1999).  Courts have provided examples of when comparator employees are "similarly situated."

See, e.g., Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803 (6th Cir. 1994) (stating that

"[i]n order for two or more employees to be considered similarly situated . . . the plaintiff must

prove that all of the relevant aspects of his employment situation are nearly identical to those of

the employees who he alleges were treated more favorably.") (citation and internal quotations

omitted); Bazargani v. Haverford State Hosp., 90 F. Supp. 2d 643, 652 (E.D. Pa. 2000)

(comparator psychiatrist not similarly situated where comparator mismedicated one patient who

did not suffer an adverse reaction unlike the two patients plaintiff mismedicated, plaintiff

presented no evidence that the comparator's actions were brought to the supervisors' attention,

and, if the supervisors were informed, plaintiff presented no evidence that the comparator was

unresponsive to the supervisors' instructions), aff'd, 33 Fed. Appx. 647 (3d Cir.), cert. denied,

537 U.S. 1029 (2002); Sherman v. Am. Cyanamid Co., 996 F. Supp. 719, 727-28 (N.D. Oh.

1998) (comparators not similarly situated where they out-performed plaintiff in sales and rank in

a national sales program standings), aff'd, 188 F.3d 509 (6th Cir. 1999), cert. denied, 529 U.S.

1037 (2000); Reese v. Reading Hosp. and Med. Ctr., 1997 WL 688808, at *5  (E.D. Pa. Oct. 24,

1997) (comparator not similarly situated where she consistently met the minimum standard for

performance with only occasional below standard performance and where plaintiff more often than not fell below the minimum standard), aff'd, 159 F.3d 1353 (3d Cir. 1998); Dill v. Runyon, 1997 WL 164275, at *4 (E.D. Pa. April 3, 1997) (comparators not similarly situated where they were terminated without cause, while plaintiff was terminated with cause).

Considering the evidence in the light most favorable to plaintiff, the court concludes that the comparators in this case are Carter, Merkel, Sipple and DeWit.  The court next must determine whether these comparators were "similarly situated" for the purposes of establishing a prima facie case of age discrimination.  After supervising for only a couple of months, Schweizer evaluated the performance of plaintiff, Carter, Merkel, Sipple and DeWit. Carter, Merkel and plaintiff each received scores on their 2001 evaluations (for calendar year 2000) of "3" in "business results" and "2" in "leadership skills."  DeWit received a score of "4" and Sipple received a "3" in both of these categories.  (Ex. P-49, Ex. P-50, Tr. 664.)  The court will consider each of these comparator employees separately to determine whether the evidence presented shows that any of them are "similarly situated" to plaintiff for purposes of establishing a prima facie case of age discrimination.

**Merkel.**  Plaintiff and Merkel were placed on a PPI.  With respect to Merkel, the evidence presented at trial revealed that he received the same evaluation scores as plaintiff and was placed on a PPI at or about the same time.  (Tr. 47-48, Ex. P-47.)  Both Merkel and Schweizer testified that Merkel responded differently to the PPI than plaintiff.  Merkel, although

initially angry about the PPI, contacted Schweizer, discussed the PPI, and worked to resolve the

issues raised in the PPI.  (Tr. 47-49, 316-17.)[18]

> Merkel testified that he did the following after receiving the PPI:

>> I drive back to Reading, then I . . . sent him an e-mail saying, I don't agree with this part, this part, and this part, you know.  The only one I remember specifically was a replacement of a television that . . . the screen had turned blue . . .
>>
>> But that's where I was frustrated, because Phil didn't know all the circumstances . . .
>>
>> . . . .
>>
>> [Schweizer] e-mailed back that . . . he expects processes to be followed, and . . . I said, that's fine, I . . . agree . . .. And after 30 days we sat down and reviewed it.
>>
>> At that point he blacked out one section of the PPI.  That was the section about the TV . . .. So he said that . . . shouldn't have been in there.  I was wrong . . .
>>
>> . . . .
>>
>> [Thirty] days later . . . he sat down and said, Look, I . . . misunderstood what you were doing, I . . . was misinformed . . . I just . . . got it wrong.
>>
>> And that was a big turning point in our relationship, because until then, we were at each other's throats pretty much.

(Tr. 47-48, 49.)

> The evidence presented at trial showed that plaintiff did not exert effort similar to

that of Merkel after receiving the PPI.  In fact, plaintiff admitted to the contrary.  (Tr. 685-86.)

Plaintiff testified as follows on cross-examination:

---

[18]      Plaintiff originally contended that Carter, Merkel and DeWit received the same evaluation scores as plaintiff in 2001, for the year 2000, but were treated more favorably because they were not placed on a PPI and subsequently fired.  (Pl.'s Mem. of Law Supp. Summ. J. at 14-15, 16 ("Schweizer rated Merkel as 2 in business and 3 in leadership in 2001 but Schweizer did not place him on PPI for 2001 or terminate him.").)  Both Merkel and Schweizer testified that Merkel received a PPI.  In fact, plaintiff called Merkel as a witness and elicited direct testimony that he was placed on a PPI.  (Tr. 47-48, 51-52.)  Plaintiff apparently now has withdrawn his contention that Merkel did not receive a PPI and instead argues that Merkel was treated more favorably than plaintiff because he was afforded a meeting with Schweizer and provided guidance and an opportunity to get off the PPI, while plaintiff was not.  (Pl.'s Surreply at 12-13.)

Q.      Now, when you went through this Performance Plan for Improvement, your response to [it] was it's unfair, right?

A.      Yes.

Q.      You didn't have any other substantive response, correct?

A.      No.

Q.      You didn't go to Mr. Schweizer and say . . . , hey, Phil . . . I know it says . . . that I didn't do the multiple attempt report.  Let me show you the reports here. . . . Let's go to the computer, let's look at them and clear this up.  You must misunderstand.  You didn't do that, did you?

A.      Mr. Schweizer wasn't receptive to me.

Q.      Mr. Steward, you didn't do that, did you?

A.      No, not at that time.

(Tr. 685-86.)  Schweizer confirmed plaintiff's testimony that plaintiff's only response to the PPI was to write that it was unfair and that plaintiff did not provide a substantive response to the issues raised in the PPI.  (Tr. 316.)  While plaintiff argues that Schweizer did not provide him with the same opportunity as Merkel to meet with Schweizer and work to resolve the issues raised in the PPI, plaintiff admits that he did not seek such an opportunity after receiving the PPI.

Plaintiff's testimony at trial revealed that he did not seek such an opportunity after the April 2001 follow-up meeting with Schweizer.  On cross-examination, plaintiff testified as follows:

Q.      And you saw that [referring to Ex. D-17] roughly . . . late April, '01, right?

A.      Yes.

Q.      You didn't go back to Mr. Schweizer and say . . . you must be mistaken.  Here are the work orders.  It shows that they are all happy.  You didn't do that, did you?

A.      No, not at that time.

Q.      As you sit here today, do you think maybe that would have been a good thing to do?  . . .

A.      Yes, it would have been at that time.

Q.      And we know that because you've . . . shown the work orders to us.  But at the time when Mr. Schweizer is telling you that you failed to follow-up with the particular customers, you never went back to him and attempted to correct his misunderstanding . . . about those customers, right?

A.      Not at that time, no.

32

> Q.   So . . . is that the only thing maybe that wasn't an A-plus response? Because you said it might have been a good thing to do.  So, that wasn't A-plus, right?
>
> A.   That was an A-plus response.  At a later date, I then tried to get back to him with it to discuss this.
>
> Q.   But at the time that he gave these to you, you didn't go back?
>
> A.   No.
>
> Q.   Now, you do recall finishing that meeting by just simply getting up and walking out and saying is that it, correct?
>
> A.   Yes.

(Tr. 729-30.)

Any similarity between Merkel and plaintiff ended at the time they each received the PPIs.  Once they received the PPIs, Merkel and plaintiff reacted dissimilarly.  Merkel's response to the PPI creates such differentiating and mitigating circumstances as to render he and plaintiff not "similarly situated."  In Mazzella v. RCA Global Communications, Inc., 642 F. Supp. 1531 (S.D. N.Y. 1986), aff'd, 814 F.2d 653 (2d Cir. 1987), the court found that comparators were not similarly situated to the plaintiff-employee where one comparator tried very hard to perform his assigned duties and requested a transfer while the plaintiff did not.  The court stated that the plaintiff did not perform properly because she "exerted insufficient effort." Id. at 1546.  The court noted that plaintiff and the comparator "had performance deficiencies that differed in cause, in nature, and in the extent to which they could be remedied by further effort on their respective parts."  Id.  Hence, plaintiff and the comparator were not similarly situated.

Here, Merkel exerted effort to address the issues raised in the PPI, while plaintiff did not.  Plaintiff testified that he later attempted to contact Schweizer to address the problems raised in the PPI and subsequent follow-up meeting.  Plaintiff claimed that Schweizer avoided him.  (Tr. 233.)  Schweizer also admitted that there was not much communication between

himself and plaintiff.  (Tr. 337.)  However, plaintiff produced no evidence that he exerted the same type of effort exerted by Merkel to address the issues raised in the PPI.[19]

Additionally, Merkel did not have the same problems with the PDC Sweep or deadlines, or the same magnitude of customer complaints as plaintiff.  Hence, for all these reasons, Merkel and plaintiff are not "similarly situated" for the purposes of establishing a prima facie case of age discrimination.

**Carter.**  Carter received the same scores as plaintiff and Merkel, but was not placed on a PPI.  Schweizer testified that Carter's deficiencies were different that plaintiff's.  (Tr. 289.)  Schweizer testified that Carter understood the technical side of his job and had good technical abilities within the office.  Id.  Schweizer noted that Carter did not always understand how what he did affected the financial and he lacked some leadership skills.  Id.  Plaintiff, however, had knowledge of the product being repaired, but had poor customer service skills, lacked a strong background in understanding the financials, and did not understand defendant's processes and procedures.  Id.

---

[19]    Plaintiff testified that "[He] tried to meet with [Schweizer] all the time."  (Tr. 768.)  See also Tr. 817 (Plaintiff testified that he tried to meet with Schweizer "any number of different times," but that Schweizer said he was "too busy."  Plaintiff stated that Schweizer met with him for only "[f]ive minutes or less" when he was given the PPI.).  However, plaintiff presented no evidence to support his claim that Schweizer rejected his attempts to meet to discuss the issues raised in the PPI.  Moreover, Plaintiff admitted that he did not attempt to show Schweizer that he was mistaken after plaintiff received the PPI nor after the April 2001 meeting.  See Tr. 685-86, 729-30.  Plaintiff also did not, like Merkel, send Schweizer an immediate e-mail communication addressing the PPI.  Further, plaintiff testified that he printed documents on June 28, 2001, days before he was terminated, because he was "hoping to have a meeting with . . . Schweizer to go over the amount of work that I was doing."  (Tr. 767.)  The evidence clearly shows that plaintiff did not exert the same immediate and strong effort to address the problems raised in the PPI as did Merkel.

Carter, however, was forty-five years of age at the time, only five years younger than plaintiff.  Even if Carter were "similarly situated" to plaintiff for the purposes of the <u>prima</u> <u>facie</u> case, Carter, at only five years younger that plaintiff, was not a substantially younger individual who was treated more favorably than plaintiff for the purposes of this ADEA case.

Plaintiff also asserted that Carter had difficulty clearing his "in-warranty screens," and that plaintiff had to assist Carter in completing this task.  (Pl.'s Mem. of Law Opp. Mot. at 51.)  However, the testimony revealed that Carter could not complete clearing the in-warranty screens because he was away for two weeks in June 2001 on National Guard duty and Schweizer asked the three other Technical Managers, plaintiff, Merkel and Sipple, to assist in clearing Carter's screens due to Carter's absence.  (Tr. 256, 1297-98.)  Moreover, even if Carter did have difficulty clearing in-warranty screens, Carter did not have the other difficulties attributed to plaintiff.  Carter did not have the same problems with the PDC Sweep or deadlines, or the same magnitude of customer complaints.  For these reasons, Carter is not "similarly situated" for the purposes of establishing a <u>prima</u> <u>facie</u> case of age discrimination.

**Sipple**.  Sipple did not receive the same performance review scores as plaintiff. Sipple received a "3" in both "leadership" and "business results."  (Ex. P-50, Tr. 664.) Moreover, she did not have the same problems with the PDC Sweep, deadlines, or customer complaints as plaintiff.  Hence, she is not similarly situated for the purposes of establishing a <u>prima</u> <u>facie</u> case.

**DeWit**.  DeWit did not receive the same performance review scores as plaintiff. DeWit received a score of "4" in both "leadership" and "business results."  (Ex. P-49.)  DeWit was not a Technical Manager at the time plaintiff was fired, so he was not subject to the same

standards as plaintiff during the relevant time period.[20]  Hence, DeWit is not "similarly situated" for the purposes of establishing a prima facie case.

The case law is clear.  In order to be "similarly situated" for purposes of establishing a prima facie case, plaintiff must prove that the comparator employees dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct and the employer's treatment of them for it.  Bullock, 71 F. Supp. 2d at 489-90.  The evidence reveals that Carter, Merkel, Sipple, and DeWit were not engaged "in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct and the employer's treatment of them for it."  Bullock, 71 F. Supp. 2d at 489-90.  Here, the comparators plaintiff identifies had numerous differentiating or mitigating circumstances that render them not "similarly situated" for the purposes of the prima facie case.  Hence, plaintiff has failed to establish the fourth prong of the prima facie case as well.  The court will now consider whether

---

[20]    Plaintiff contends that DeWit received more favorable treatment because Schweizer asked plaintiff to clean the tractor yard even though cleaning the yard was DeWit's responsibility.  (Pl.'s Mem. of Law at 48 (citing Tr. 1287).)   In support of this argument, plaintiff cites to DeWit's testimony that as of the date of his testimony, he was a Technical Manager in Wilmington and his duties, at that time, did not include cleaning the yard.  (Tr. 1283, 1287.)  However, DeWit's testimony also revealed that the Wilmington District consolidated with the Baltimore District and was now considered a "branch."  Id. at 1283.  DeWit testified that the Wilmington facility no longer performed shop work and there is no facility for a tractor yard.  (Tr. 1299.)  Moreover, DeWit testified that in 2000, the Technical Manager was responsible for cleaning the tractor yard.  Id. at 1292.  Sipple also confirmed that the Technical Manager was responsible for cleaning the yard at the time relevant to plaintiff's termination.  (Tr. 1318.)  The evidence does not support plaintiff's argument that DeWit was treated better than plaintiff because, in 2001, plaintiff was required to clean the tractor yard and, long after the fact, DeWit was not required to clean the tractor yard at a reconfigured Wilmington facility which had no tractor yard.

plaintiff met his ultimate burden of proving that the reasons articulated by defendant for plaintiff's firing were pretextual.

### 2.     **Pretext**

Once defendant met its burden of production by articulating reasons for plaintiff's termination, plaintiff bears the ultimate burden of proving that the reasons were pretextual. Defendant's burden is "'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'"  Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (quoting Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).  To satisfy this burden, plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764.  See also Tomasso, 445 F.3d at 706 (same). Plaintiff must do more than show that defendant was wrong or mistaken to terminate him.  Id. at 765.  Plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision."  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (emphasis added).  In other words, plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"

<u>Fuentes</u>, 32 F.3d at 765 (footnote omitted) (citing cases).  <u>See also</u> <u>Tomasso</u>, 445 F.3d at 707 (same).[21]

However, as the Third Circuit Court of Appeals stated in <u>Fuentes</u>, the employee need not always offer evidence sufficient to discredit all of the rationales advanced by the employer.  "If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder."  32 F.3d at 764 n.7; <u>see also</u> <u>Kautz</u>, 412 F.3d at 467.  In <u>Fuentes</u>, the court explained that the rejection of some explanations may also undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales.  32 F.3d at 764 n.7.  <u>See also</u> <u>Tomasso</u>, 445 F.3d at 707.

It is important to note that the evidence must be directed at the decision-maker's belief.  <u>Simpson v. Kay Jewelers, Inc.</u>, 142 F.3d 639, 647 (3d Cir. 1998) ("Simpson's view of her performance . . . is not relevant."); <u>Billet</u>, 940 F.2d at 825 (employee's subjective personal judgment of his competence standing alone does not raise genuine issue of material fact); <u>Cohen v. Pitcairn Trust Co.</u>, 2001 WL 873050, at *7 (E.D. Pa. June 20, 2001) ("[I]t is the [decision-maker's] perceptions that count, and not what the plaintiff claims is the objective truth.").  <u>See also</u> <u>Martin v. Health Care & Retirement Corp.</u>, 67 Fed. Appx. 109, 113 (3d Cir. 2003) (even if employer was remiss in relying on complaints relayed to him by others, the question is whether

---

[21]     As noted above, defendant admits that it was unable to locate a variety of employment records related to this case.  Courts have held that no unfavorable inference arises when a document or article in question has been lost or accidently destroyed.  <u>See</u> <u>Harding v. Careerbuilder, LLC</u>, 2006 WL 460896, at *3 (3d Cir. Feb. 27, 2006) (not precedential); <u>Brewer</u>, 72 F.3d at 334.

the employer actually believed the complaints to be true; plaintiff did not submit evidence suggesting that the employer did not believe the complaints) (not precedential).

### a.    Defendant's Reasons for Terminating Plaintiff

Defendant offers three age-neutral reasons for plaintiff's termination.  <u>See</u> Ex. P-43.  We will consider these reasons in turn, applying the standards described above.

### i.    Completion of Assigned Tasks.  As of late June 2001, plaintiff failed to timely submit vacation records, failed to timely clean the tractor yard, had been responsible for two mower backlogs[22], and failed to perform the PDC Sweep properly.

It is irrelevant if plaintiff thought he had completed all of these tasks correctly. Plaintiff presented no evidence that Schweizer did not believe that plaintiff failed to complete these tasks properly and/or timely.  Plaintiff's belief that the quality of his work was "A+" or that the work difficulties were not his fault, does not "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendant's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." <u>Fuentes</u>, 32 F.3d at 765.

Moreover, as detailed herein, plaintiff admitted that the problems with the vacation logs, mower backlogs and the PDC Sweep were not due to his age.  (Tr. 691, 696, 720, 734-35, 755-56.)  With respect to cleaning the tractor yard, plaintiff admitted that it was not

---

[22]    Plaintiff contends that Carter testified that "the mowers were the responsibility of all the technical managers."  (Pl.'s Mem. of Law Opp. Mot. at 63 (citing Tr. 999).)  Plaintiff has cited to the record inaccurately.  When asked, "In the spring of 2001, whose responsibility was it to oversee the lawnmowers at the shop?," Carter responded, "Mr. Steward runs the shop."  (Tr. 1000.)

unreasonable for Schweizer to assign that task to him since he was responsible for the lawnmower and tractor repairs.  (Tr. 755-56.)

      **ii.**    **Customer Complaints.**  Another reason proffered by defendant for plaintiff's termination was his lack of responsiveness to customer complaints.  In an effort to show that defendant's reason was pretextual, plaintiff offered evidence that the customers referenced in the PPI ultimately were satisfied.  This evidence does not show any weaknesses, implausibilities, incoherencies or inconsistencies in defendant's explanation.  The fact that the customers eventually were satisfied does not show that plaintiff had no problem with customers or that the customers identified were not upset.  Plaintiff presented no evidence from the customers that they did not have complaints, and no evidence that other Technical Managers had similar customer issues.[23]

      At trial, plaintiff testified that Schweizer's criticism about multiple attempt repairs was "not true," and that he "routinely check[ed] multiple attempts to see what was going on." (Tr. 184.)  Plaintiff, however, presented no evidence that Schweizer knew that his criticisms were untrue and made them anyway.  (Tr. 685-86.)  Similarly, plaintiff argued that he was trying to discern whether customer Montana's dishwasher should be covered by a warranty and that the technician assigned to customer Montana underwent emergency surgery.  (Tr. 185-87.) However, the evidence showed that Schweizer's concern was that plaintiff failed to return a

---

[23]    Plaintiff claimed that other Technical Managers also had problems with customer complaints.  (Pl.'s Mem. of Law Opp. Mot. at 51 (citing the Trial Transcript).)  However, the testimony cited by plaintiff does not reveal that other Technical Managers had the same type or number of problems with customer complaints as did plaintiff.

customer telephone call and plaintiff admitted that he had not returned the call for a week.  (Tr. 687.)

In notes dated June 25, 2001, made just prior to the preparation of the Notice of Termination, Schweizer noted that while plaintiff has improved his customer relations skills, "he is still not at the level he needs to be."  (Ex. D-21.)  Schweizer described the following incident:

> Recently, an upset customer at he [sic] counter was brought to the attention of [plaintiff] by a sales floor representative, [plaintiff] informed that sales floor person he was eating lunch and could not be bothered.  When the sales floor person told me, I had him tell [plaintiff] that he should handle the customer.  [Plaintiff] then proceeded to have a drawn out discussion with the angry customer in the center of the busy sales floor as opposed to a more private area of the building.

Id.  Plaintiff presented no evidence that Schweizer believed this information was untrue but relied upon it in any event to terminate plaintiff.

### iii.       **Missed Promise Dates and Failure to Take Ownership of Shop Workload.**  In the PPI, Schweizer criticized plaintiff for a lack of involvement in multiple repair attempts, as is required of Technical Managers.  (Ex. D-17.)  Plaintiff admitted that Technical Managers were to be involved in multiple repair attempts, and argued at trial that he "routinely check[ed] multiple attempts to see what was going on."  (Tr. 184.)  Plaintiff offered no evidence that Schweizer did not believe that plaintiff was not properly involved in multiple repair attempts.

In the Termination Notice, Schweizer stated that plaintiff's "failure to satisfy customers is demonstrated in missed promise dates in the shop.  This is a direct result of [plaintiff's] failure to take ownership of the shop workload."  (Ex. P-43.)  In his notes made just prior to preparing the Notice of Termination, Schweizer explained that the shop was again

41

backed-up with mowers.  (Ex. D-21.)  As of June 25, 2001, 100 out of 122 orders were waiting

service past the promise date.  Id.  Schweizer noted that plaintiff had not come to him with a plan

to rectify the situation.  Id.  Plaintiff admits that he was responsible for the second mower

backlog and its elimination.

Plaintiff testified as follows with respect to his efforts to eliminate the second

mower backlog:

> Q.     Now, when the mowers came back from New York and were distributed
>        out to the customers . . . there was still a backlog, wasn't there?
> A.     Yes.
> Q.     And your response to that second backlog was to kind of throw up your
>        hands and say, you know, once you get behind on the board, it's just hard
>        to catch up . . . wasn't that your response?
> A.     Yes, that's true.
> Q.     Now, is that . . . an A-plus response of a manager to say I've got a backlog.
>        I've got customers sitting, waiting.  My state of service is blown out the
>        window.  But . . . once the board is backed up, it's hard, it's tough.  And is
>        that an A-plus response.
> A.     Yes, it is.  It's a fact, once you're behind, you're behind.  It's not that you
>        stop working.  It's you continue to work and try and get it done. . . .
> . . . .
> Q.     Yeah.  Now, Mr. Schweizer, didn't he come in on a weekend and recruit
>        your techs to come in with him on a weekend, specifically to clear that
>        backlog?  Didn't he do that?
> A.     Yes . . ..
> . . . .
> Q.     . . . [D]o you believe that Mr. Schweizer came in and worked all weekend
>        fixing mowers or assisting in fixing mowers, do you believe he did that to
>        discriminate against you because of your age?
> A.     No.

(Tr. 731-32, 734-35.)

Plaintiff contends that certain documents reveal that he was the most productive

manager completing vastly more calls than the other Technical Managers.  In particular, plaintiff

cites to Ex. P-33, which shows that as of June 28, 2001, his technicians had completed 35,272

42

calls.  The same exhibit shows that Merkel's technicians had completed 17,740 calls, Sipple had

completed 9,947 calls, and Carter had completed 17,237 calls.  (Ex. P-33.)  Plaintiff argues

Schweizer should have considered this evidence, as well as plaintiff's employment history with

defendant, in making the decision to fire plaintiff.  Plaintiff also asserts that this evidence shows

defendant's stated reasons for terminating plaintiff were pretextual.

    Defendant presented evidence which showed that the numbers are misleading.

Schweizer testified that the report showed calls for the individual technicians assigned to plaintiff

on the date the report was printed.  (Tr. 406-08.)  Hence, the technicians might not have been

assigned to plaintiff for the entire year.  However, giving plaintiff every reasonable inference

from the evidence, the court will assume that plaintiff's technicians completed 35,272 calls as of

June 28, 2001.  This assumed fact does not render defendant's reasons for terminating plaintiff

pretextual.  The law in the Third Circuit is clear that "the focus is on the particular criteria or

qualifications identified by the employer as the reason for the adverse action."  Simpson, 142

F.3d at 647 (citing Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 528 (3d Cir.

1992), cert. denied, 510 U.S. 826 (1993)).  The Third Circuit Court of Appeals went on to

explain as follows:

> The employee's positive performance in another category is not relevant, [Ezold,
> 983 F.2d at 528], and neither is the employee's judgment as to the importance of
> the stated criterion, Healy v. New York Life Ins. Co., 860 F.2d 1209, 1216 (3d
> Cir. 1988).  Furthermore, the court does not subjectively weigh factors it considers
> important.  Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3d Cir.
> 1995); see also Ezold, 983 F.2d at 528 (rejecting district court's subjective
> weighing of plaintiff's abilities).  Rather, the plaintiff must point to evidence from
> which a factfinder could reasonably infer that the plaintiff satisfied the criterion
> identified by the employer or that the employer did not actually rely upon the
> stated criterion.  Fuentes, 32 F.3d at 767.

Id.  See also Kautz, 412 F.3d at 471 ("[I]t is axiomatic that the mere fact that a different, perhaps

better, method of evaluation could have been used is not evidence of pretext unless the method

that was used is so deficient as to transgress the Fuentes standard.").

   In Simpson, an ADEA case, the plaintiff relied upon evaluation scores in arguing

that, as compared to another employee, her allegedly superior performance but less favorable

treatment discredits the defendant's proffered reasons for her demotion. 142 F.3d at 647.  The

court concluded that since the defendant did not represent that it relied upon evaluation scores,

the plaintiff's view of her performance as measured by the evaluation scores was irrelevant.  Id.

Instead, focusing on the stated criterion, sales quotas, the comparator employee's performance

was superior to the plaintiff's, a result the plaintiff did not dispute.  Id.

   In the instant case, defendant outlined its reasons for terminating plaintiff.  It did

not rely upon the numbers set forth in Exhibit P-33 representing the calls completed by plaintiff's

technicians in making that decision.  Plaintiff's belief regarding the number of calls completed by

his technicians is irrelevant in the instant matter.  Plaintiff presented no evidence to dispute the

issues defendant raised in the PPI and subsequent meetings.  Plaintiff presented no evidence that

the reasons stated by defendant for his termination were pretextual.  As explained by the Third

Circuit Court of Appeals, "[e]vidence that the method of evaluation an employer used was not

the best method does not amount to evidence that the method was so implausible, inconsistent,

incoherent or contradictory that it must be a pretext for something else."  Kautz, 142 F.3d at 471.

   Plaintiff asserted that his positive past employment history could establish that the

reasons proffered by defendant for his termination were pretextual.  However, in Kautz, the Third

Circuit Court of Appeals held that "the attempt to use past performance reviews to show more

44

recent criticism was pretextual fails as a matter of law." Id. at 474 (citing Ezold, 983 F.2d at 528).  The Third Circuit Court of Appeals also has held that "[p]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations."  Ezold, 983 F.2d at 528.

Plaintiff also contends that the fact that he received a bonus and raise after being placed on the PPI proves that defendant's reasons for terminating plaintiff were pretextual.  The court disagrees.  Schweizer testified that the award of raises and bonuses is prescribed according to a "grid" and that plaintiff received a decreased bonus and raise during the relevant time period.  (Tr. 297-300.)  No contrary evidence was presented.

### b.      **Reasons Offered By Plaintiff For His Termination**

The court has just reviewed the three reasons identified by defendant for plaintiff's termination.  At trial, plaintiff stated why he thought he was terminated.  Considering the evidence in the light most favorable to plaintiff and drawing all fair and reasonable inferences in favor of plaintiff, the court will consider whether any of the reasons offered by plaintiff prove that defendant's stated reasons were pretextual.  Plaintiff testified as follows:

> I believe it was because of my age.  I believe the younger techs were . . . held to a different standard than I was. . . . I had excellent numbers.  I had twice as much work production as they did.  They had the same rating scores that I did, yet, they weren't put on PPIs.  I did nothing wrong.  I worked hard and I was terminated.
> . . . .
> I believe there was a paper trail being set up the whole time that I didn't realize.  I was given extra duties that were out of the norm of what my job was. . . . The paper trail was set up with duties that I was set up to fail with.

Tr. 622-26.  See also Tr. 636-67 (further elaboration).

45

i.      **Number of Technicians.**  Plaintiff asserted that he was subject to age discrimination because he had more technicians than any of the other Technical Managers.  (Tr. 667.)  However, plaintiff admitted that Exhibit P-73 showed that he had twenty-four technicians while Carter had twenty-three technicians, just one less.  (Tr. 669, Ex. P-73.)  Plaintiff also admitted that all of Carter's technicians were road technicians, while sixteen of his technicians were road technicians and the balance of eight technicians worked in the shop located at the Wilmington facility.  (Tr. 670.)  Plaintiff agreed that it could be more difficult to supervise road technicians than shop technicians.  (Tr. 671.)  DeWit testified that shop technicians are more efficient than road technicians.  (Tr. 1255.)  Sipple testified that shop technicians are able to complete more repairs because they are not required to drive to the customers' homes.  (Tr. 1303.)  Schweizer testified that "site" technicians clear less calls because they travel to customers' homes and have additional duties such as selling maintenance agreement.  (Tr. 282.)

Plaintiff also admitted that Roy Vassar, a previous supervisor, increased the number of technicians plaintiff supervised in mid-2000.  Plaintiff admitted that age played no role in Mr. Vassar's assignment of technicians to plaintiff.  (Tr. 676.)  Plaintiff admitted that Schweizer's continuation of the assignment of technicians Mr. Vassar put in place had nothing to do with plaintiff's age.  (Tr. 679-80.)

ii.      **The PDC Sweep.**  Plaintiff admitted that age had nothing to do with the PDC Sweep and Schweizer's complaints regarding the PDC Sweep.  (Tr. 696.)  Plaintiff also admitted that the lack of parts was the only reason for the lawnmower backlog.  (Tr. 706.)  Plaintiff testified that he was responsible for the backlog and its elimination.  (Tr. 719.)  Plaintiff acknowledged that neither Schweizer nor age played a part in him being denied replacement

46

parts from another facility.  (Tr. 718, 720.)  Plaintiff admitted that Schweizer's working on a

weekend to help clear the mower backlog had nothing to do with plaintiff's age.  (Tr. 734-35.)

        Viewing the evidence in the light most favorable to plaintiff, even if plaintiff

followed the directions from "Hal," plaintiff failed to produce evidence showing that Schweizer

did not believe that plaintiff erred during the PDC Sweep.

        **iii.**    <u>**Vacation Numbers.**</u>  Plaintiff admitted that he turned in the vacation

numbers late.  (Tr. 691.)  Plaintiff testified that the numbers were lost when his office was

moved.  Plaintiff admitted that age had nothing to do with his office being moved.  <u>Id.</u>

        **iv.**    <u>**Customer Complaints.**</u>  Plaintiff admitted that he did not return customer

Montana's call for one week.  (Tr. 687.)  Plaintiff testified that he knew customer Montana

repeatedly called and asked to speak to plaintiff but that he did not return her call for one week.

(Tr. 687, 689.)

        **v.**    <u>**Freon Storage.**</u>  Plaintiff testified that Schweizer's criticisms regarding

the storage of freon had nothing to do with his age.  (Tr. 747.)

        **vi.**    <u>**Cleaning the Tractor Yard.**</u>  Plaintiff admitted it was conceivable that

the person in charge of repairing the tractors would be responsible for cleaning the tractor yard.

(Tr. 755-56.)  He also admitted that it was not unreasonable for Schweizer to assign to him the

duty of cleaning and organizing the tractor yard since he was the Technical Manager responsible

for the tractor repairs.  <u>Id.</u>  Even assuming plaintiff was correct in that it was not his duty to clean

the tractor yard and Schweizer was incorrect in believing it was plaintiff's responsibility, "pretext

is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual

dispute at issue is whether discriminatory animus motivated the employer, not whether the

47

employer is wise, shrewd, prudent or competent.'" <u>Kautz</u>, 412 F.3d at 467 (citing <u>Fuentes</u>, 32 F.3d at 765).

Plaintiff admitted that an "A+" Technical Manager would take extraordinary measures to meet the deadline for cleaning the tractor yard.  (Tr. 758.)  Plaintiff admitted that he attempted to clean the tractor yard during his normal hours, and did not work the Saturday before the deadline to clean the yard.[24]  (Tr. 765.)

vii.   **Truck Maintenance.**  Plaintiff admitted that the transfer of responsibility for truck maintenance to the Technical Managers had nothing to do with age.  (Tr.  845.)  Plaintiff acknowledged in his testimony that this would be more of a burden for Carter since Carter had more trucks.  <u>Id.</u>

viii.   **The PPI.**  Plaintiff admitted that when he received the PPI, he did not go to Schweizer in an effort to show him where he was mistaken or misunderstood.  (Tr. 685-86.)  Plaintiff admitted that nothing in the PPI was unreasonable.  (Tr. 747.)

Plaintiff testified that after the first follow-up meeting on April 26, 2001, he left the meeting and did not get back to Schweizer to show him that he was mistaken or misunderstood.  (Tr. 729.)  In response to Schweizer's criticisms during the April 2001 follow-up meeting, plaintiff testified that the two employees referenced by Schweizer, Lindsay and McNeese, were subsequently placed on PPIs, and acknowledged that employee Pandora Cresbo was experiencing family problems which impacted her work.  (Tr. 231-33.)  Plaintiff presented no evidence that he placed the employees on PPIs prior to Schweizer's criticisms.  Rather, the

---

[24]    <u>See</u> <u>supra</u> n.6.

evidence plaintiff presented showed that the employees in question were suffering performance deficiencies consistent with Schweizer's criticisms.

   c.  **The "Ageist" Remark.**

   As detailed above, plaintiff admitted that the various reasons he claims were evidence of age discrimination had nothing to do with his age.  These include his workload, number of technicians, customer issues, freon storage, truck maintenance, tractor yard clean up, PDC Sweep, PPI items and mower backlogs.  The last piece of evidence which could support plaintiff's claim of age discrimination is the alleged "ageist" remark made by Schweizer in May 2001:  "Hell, you are old enough, you have been around long enough, you should handle this." Schweizer does not recall making this comment.  (Tr. 364.)  The court will assume Schweizer made this comment.  Plaintiff contends that Schweizer made this comment after plaintiff complained about all of the Technical Managers being assigned the additional duties of truck maintenance.  Defendant contends that the comment was merely a stray remark not linked to the termination decision or any criticism of plaintiff's performance.  (Def.'s Br. Supp. Mot. at 46-47.)

   The case law regarding ageist comments and stray remarks is well settled.  In Ezold, the Third Circuit Court of Appeals concluded that "stray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight."  983 F.2d at 523.  In Valentin v. Crozer-Chester Medical Center, 986 F. Supp. 292 (E.D. Pa. 1997), the jury returned a verdict in favor of the plaintiff on his national origin discrimination claim.  The only evidence of discriminatory animus was "stray remarks by supervisors and co-workers."  Id. at 301.  The evidence revealed that Valentin's supervisor said, "it's a shame we can't hire them all white" and

that she would not contact a prospective employee because "she might have been Filipino."  Id.

The court found that the statements were not related to the termination decision at issue in the

case.  Id.  Without the critical link between the evidence of discriminatory evidence and the

decision impacting the plaintiff, a finding of intentional discrimination cannot be found.  Absent

this link, the court overturned the jury verdict and entered judgment as a matter of law in favor of

the defendant on plaintiff's retaliatory treatment (with certain time frames noted) and national

origin claims.  Id. at 301-02.

   The supervisor's remark in the instant case is less compelling than those in

Valentin.  The statements in Valentin clearly indicate a bias in favor of white employees and

against Filipino employees.  The statement attributed to Schweizer does not indicate a clear bias

in favor of younger employees and against older employees.  The statement is susceptible to an

age-neutral interpretation: that plaintiff had sufficient experience to handle the additional truck

maintenance duties being assigned to all Technical Managers.  Additionally, plaintiff admitted

that age played no role in the truck maintenance duties being assigned to the Technical

Managers.  Assuming that Schweizer did make the statement, it was made after the PPI was

given to plaintiff and after the first follow-up meeting in April, 2001.  Hence, the statement

played no part in the issuance of the PPI or in the conduct of the April 2001 meeting.  Moreover,

it was made in mid-May 2001, and plaintiff was terminated on July 2, 2001, approximately six to

seven weeks later.  The record contains no evidence that the statement played any role in

plaintiff's termination.  Rather, the statement appears to be an isolated statement addressing

plaintiff's complaints about being assigned additional duties and Schweizer's reaction to

plaintiff's complaints.

Plaintiff contends that the Supreme Court has held that evidence of ageist comments may cast doubt on the reasons an employer offers for action taken against an employee. In <u>Reeves</u>, the Court concluded that evidence of a supervisor's statement that the plaintiff was "so old he must have come over on the Mayflower," and "too damn old to do his job" was relevant evidence of pretext as to whether the employer's actions were motivated by age-related animus, despite the fact that the comments were made several months before the firing. <u>Reeves</u>, 530 U.S. at 133. This court agrees that ageist comments can be relevant to determining whether an employer's proffered reasons for adverse employment action are pretextual. Exactly how relevant the comments will be depends upon the content of the comments and their temporal proximity to the adverse employment action. <u>Gomez v. Allegheny Health Svcs., Inc.</u>, 71 F.3d 1079, 1085 (3d Cir. 1995), <u>cert</u>. <u>denied</u>, 518 U.S. 1005 (1996).

Here, the comment made by Schweizer is unlike the comments in <u>Reeves</u> which clearly showed an age bias on the part of the supervisor. Schweizer's comment shows that Schweizer believed that plaintiff had sufficient experience to handle the additional truck maintenance responsibility. Moreover, the statement was made in mid-May 2001. Plaintiff testified at trial that he knew in late March and early April, 2001 that Schweizer was concerned about plaintiff's performance in that plaintiff did not properly hire for the lawn and garden shop and did not adequately prepare for the lawn and garden season. (Tr. 738-39.) As of the end of April, 2001, plaintiff admitted that he knew he had three tasks to complete on the PPI process: contact customers daily, no service orders over thirty days, and clean the tractor yard. (Tr. 756-57.) Plaintiff also testified that he understood that if he did not complete these tasks he could be terminated. (Tr. 757.) Plaintiff admits that age played no role in these performance issues.

51

Hence, no evidence supports plaintiff's contention that Schweizer's comment was a negative statement about plaintiff's age or that it played any role in his subsequent termination.

In conclusion, this court has carefully reviewed the evidence presented at trial in the light most favorable to plaintiff, the nonmovant, and has given plaintiff the advantage of every fair and reasonable inference. As directed by Reeves and other Supreme Court precedent, when determining whether plaintiff satisfied his ultimate burden of proving by a preponderance of the evidence that age was a determinative factor in his termination, this court must consider plaintiff's prima facie case and the strength of the evidence supporting that prima facie case. As set forth above, plaintiff has not proven a prima facie case of age discrimination. Additionally, plaintiff has failed to present evidence to show that defendant's stated reasons for terminating plaintiff were pretextual. Even if this court were to conclude that plaintiff had established a prima facie case, the court would find that it was a very weak prima facie case established by only the slimmest of margins. Such a weak prima facie case, coupled with the lack of evidence showing that defendant's proffered reasons for terminating plaintiff were pretextual, would not be sufficient for plaintiff to carry its ultimate burden of proving intentional discrimination. For all of the above reasons, defendant's motion for judgment as a matter of law must be granted.

C.    **Motion for New Trial**

Defendant also filed a motion for new trial pursuant to Fed. R. Civ. P. 59. When a motion for judgment as a matter of law is accompanied by a motion for new trial, Fed. R. Civ. P. 50(c)(1) requires the court also to rule on the motion for new trial. The Rule provides in relevant part:

52

> If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for a new trial.  If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.  In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered.

Fed. R. Civ. P. 50(c)(1).  See also Roebuck v. Drexel Univ., 852 F.2d 715, 735 (3d Cir. 1988)

(discussing Fed. R. Civ. P. 50(c)).  Fed. R. Civ. P. 59(a) sets forth the grounds on which the court

may grant a motion for a new trial:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in courts of the United States;

Fed. R. Civ. P. 59(a).  Under the law of this Circuit "'[a] new trial is appropriate only when the

verdict is contrary to the great weight of the evidence or errors at trial produce a result

inconsistent with substantial justice.'"  Justofin v. Metro. Life Ins. Co., 2005 WL 758247, at *3

(E.D. Pa. April 1, 2005) (quoting Sandrow v. United States , 832 F. Supp. 918, 918 (E.D. Pa.

1993)).  When the basis of the motion for new trial is an alleged error involving a matter within

the discretion of the trial court, such as the court's evidentiary rulings or jury instructions, the

trial court has wide discretion in ruling on the motion.  Justofin, 2005 WL 758247, at *3.  See

also Link v. Mercedes-Benz of North Am., Inc., 788 F.2d 918, 921-22 (3d Cir. 1986) (same).

The court's discretion to grant a new trial is more limited when the asserted

ground is that the verdict is against the weight of the evidence.  In that instance, the Third Circuit

Court of Appeals has stated that "'new trials because the verdict is against the weight of the

evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage

53

of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" Greenleaf v. Garlock, Inc., 174 F.3d 352, 366 (3d Cir. 1999) (quoting Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991)).  It is not a proper basis to grant a new trial merely because the court would have reached a different verdict.  Kotas v. Eastman Kodak Co., 1997 WL 570907, at *7 (E.D. Pa. Sept. 4, 1997), aff'd, 166 F.3d 1205 (3d Cir. 1998) (Table).

        The standard for granting a motion for a new trial is "substantially less demanding" than that for granting a motion for judgment as a matter of law.  Lightning Lube, Inc. v. Witco Corp., 802 F. Supp. 1180, 1185 (D.N.J. 1992) (citing 9 Charles A. Wright & Arthur A. Miller, Federal Practice and Procedure § 2531, at 575 (1971)), aff'd, 4 F.3d 1153 (3d Cir. 1993).  Unlike a motion for judgment as a matter of law, the court is not required to view the evidence in the light most favorable to the verdict winner.  Valentin, 986 F. Supp. at (292).  The court is allowed to consider the credibility of witnesses and weigh the evidence.  Roebuck, 852 F.2d at 735.

        In the instant matter, the court has examined the evidence presented during the trial.  That being done, the jury's verdict was against the "clear weight of the evidence," see Roebuck, 852 F.2d 715, and this court must alternatively grant defendant's motion for a new trial.  As in Roebuck, the comparators in the instant case were neither sufficiently similar to plaintiff nor sufficiently younger than plaintiff to justify an inference of discrimination.  Additionally, the record contained overwhelming evidence that defendant had legitimate issues with plaintiff's performance.  Plaintiff admits that, other than the one comment regarding his age, none of the performance issues defendant raised had anything to do with his age.  The age

54

comment, rather than exhibiting a bias against plaintiff because of his age, expressed Schweizer's opinion that plaintiff could perform the extra work assigned because of his experience.  Any other inference regarding that statement is unreasonable.

Considering the record before the court, the jury's verdict is against the clear weight of the evidence and the verdict must be overturned and a new trial ordered to prevent a miscarriage of justice.  This is not a case where the evidence was "sharply in conflict," see Lind v. Schenley Ind., Inc., 278 F.2d 79 (3d Cir.), cert. denied, 364 U.S. 835 (1960), nor is this a case where this court seeks to supplant the jury's reasoning with its own interpretation of the facts. See Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993).  Rather, the record contained overwhelming evidence that plaintiff had performance issues which plaintiff admitted were unrelated to his age.  Defendant's motion for a new trial must be granted.[25]

---

[25]   Defendant contends that a new trial should be granted on several other grounds. The court has considered all of defendant's arguments raised in its motion.  Defendant contends that a new trial should be granted because the court erred in instructing the jury that the fourth prong of the prima facie case could be satisfied if plaintiff proved that a sufficiently younger, similarly situated person assumed his duties or was treated more favorably, rather than replaced plaintiff.  (Def.'s Mem. of Law Supp. Mot. at 60-62.)

The late Judge Becker addressed the fluid nature of the McDonnell prima facie test in Pivirotto v. Innovative Systems, Inc., 191 F.3d 344 (3d Cir. 1999):

> Immediately following [the] description of the prima facie case, the Court [in McDonnell] included this footnote:  "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations."  [411 U.S.] at 802 n.13.
>                             . . . .
> [I]n Furnco Construction Co. v. Waters, 438 U.S. 567 . . . (1978), the Court explained the purpose of the prima facie case at length.
>
> > The central focus of the inquiry in a case such as this is always whether the employer treated "some people less favorably than others because of their

---

> race, color, religion, sex, or national origin." [Int'l Bhd. of Teamsters v.
> United States , 431 U.S. 324, 335 n.15 (1977).]  The method suggested in
> McDonnell Douglas for pursuing this inquiry, however, was never
> intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a
> sensible, orderly way to evaluate the evidence in light of common
> experience as it bears on the critical question of discrimination.

Id. at 577.

Pivirotto, 191 F.3d at 352.  Judge Becker also stated that

> [w]hen actually focusing on the prima facie case, we have repeatedly emphasized
> that the requirements of the prima facie case are flexible, and in particular that
> "the fourth element must be relaxed in certain circumstances, as when there is a
> reduction in force."  Torre v. Casio, Inc., 42 F.3d 825, 831 (3d Cir. 1994). . . .
> [W]e have never held that the fourth element . . . should be relaxed only when
> there is a reduction in force. . . .  In Torre, we held that a discharged age-
> discrimination plaintiff who presented evidence that a younger employee assumed
> his responsibilities when his employer decided not to replace him had met his
> prima facie burden.  See id.

Pivirotto, 191 F.3d at 344.  See also Torre, 42 F.3d at 831-32 (in age discrimination case where
plaintiff was not replaced but remaining employees assumed his duties, court found that plaintiff
established a prima facie case where evidence showed younger employees were not transferred
when plaintiff was transferred, younger employees assumed his duties, and younger employees
were retained when plaintiff was terminated); Bullock, 71 F. Supp. 2d at 489 (noting imprecision
in language with respect to fourth prong of the prima facie case, and stating that the "nexus
required to invoke the presumption that a plaintiff was discriminated against is that the plaintiff
was subjected to less favorable treatment"); Kelly v. Drexel Univ., 907 F. Supp. 864, 873 (E.D.
Pa. 1995) (in age discrimination case, fourth prong of McDonnell Douglas test adapted to meet
specific allegations in case and plaintiff must show that "defendant employer has treated
similarly-situated employees more favorably"), aff'd, 94 F.3d 102 (3d Cir. 1996).

 The case law is clear that the requirements of the fourth prong of the McDonnell
prima facie case are flexible and must be relaxed in certain circumstances to fulfill the purposes
of the test, namely, whether the plaintiff was subjected to less favorable treatment.  This case, in
which plaintiff was not replaced and which is not a reduction in force case, is one of those cases.
See Steward v. Sears, Roebuck & Co., 312 F. Supp. 2d 719, 725 (E.D. Pa. 2004) (Judge Dubois
concluded that in a non-RIF case, "[c]ourts have generally required a plaintiff to proffer evidence
that younger employees were treated more favorably, as opposed to evidence of replacement by a
younger employee.").

**D.**     **Remittitur**

In the alternative, defendant asks the court to order remittitur of plaintiff's

damages.  A court has the power to order remittitur when "the trial judge finds that a decision of

the jury is clearly unsupported and/or excessive."  Spence v. Bd. of Educ., 806 F.2d 1198, 1201

(3d Cir. 1986).  A remittitur is in order when a trial judge concludes that a jury verdict is clearly

unsupported by the evidence and exceeds the amount needed to make the plaintiff whole, i.e. to

remedy the effects of the employer's discrimination.  Starceski v. Westinghouse Elec. Corp., 54

F.3d 1089, 1100 (3d Cir. 1995).

Defendant contends that the jury improperly disregarded the amount of

compensation plaintiff actually earned in overtime pay from his new employment and that these

---

Defendant also urges that a new trial should be granted because the jury's award
of damages is excessive in light of the evidence.  (Def.'s Mem. of Law Supp. Mot. at 62-69.)
Defendant contends that proper consideration of plaintiff's overtime hours and earnings would
reduce the jury's award of backpay and eliminate any ongoing wage loss.  The court permitted
the parties to argue to the jury the effect of overtime on plaintiff's damages.  The parties did not
object to the court's damages instructions.  Defendant's argument is waived.  See Fed. R. Civ. P.
51(c); Collins v. ALCO Parking Corp., 2006 WL 1377052, at *2 (3d Cir. May 22, 2006).

Defendant asserts that a new trial should be granted because plaintiff's counsel
improperly instructed the jury in her closing argument that an age differential of five years was
sufficient as a matter of law to establish a prima facie case of age discrimination.  (Def.'s Mem.
of Law Supp. Mot. at 69-70.)  A new trial is not warranted on this ground because the court
instructed the jury that statements by the attorneys in closing arguments regarding the law are not
controlling; the jury must apply the law as instructed by the court.  (Tr. 1489-90.)  A jury is
presumed to have followed the court's instructions, not counsel's arguments.  See Opper v.
United States, 348 U.S. 84, 95 (1954) ("Our theory of trial relies upon the ability of a jury to
follow instructions."); United States v. Hernandez, 176 F.3d 719, 734 (3d Cir. 1999) (court
assumes jurors follow the accurate, formal instructions of the court).

amounts should have been deducted from plaintiff's backpay award and would have offset

entirely plaintiff's award of frontpay.  This is one of the arguments defendant made in its motion

for a new trial.  <u>See</u> <u>supra</u> n.25.  Defendant's request for remittitur is denied.

       An appropriate order follows.


       BY THE COURT:


       <u>\s\ Thomas J. Rueter </u>
       THOMAS J. RUETER
       United States Magistrate Judge